ANTHONY RAFTOPOL ET AL. *v.* KARMA
A. RAMEY ET AL.
(SC 18482)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and
McLachlan, Js.*

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued March 16, 2010—officially released January 5, 2011**

** January 5, 2011, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Patrick B. Kwanashie*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, former attorney general, for the appellant (defendant department of health).

*Victoria T. Ferrara*, with whom was *Jeremy F. Hayden*, for the appellees (plaintiffs).

*Kenneth J. Bartschi, Karen L. Dowd, Thomas W. Ude, Bennett H. Klein*, pro hac vice, *Karen L. Loewy*, pro hac vice, *John Weltman*, pro hac vice, and *Scott Buckley*, pro hac vice, filed a brief for the American Society for Reproductive Medicine et al. as amici curiae.

*Opinion*

McLACHLAN, J. This appeal raises the question of whether Connecticut law permits an intended parent[1] who is neither the biological[2] nor the adoptive parent of a child to become a legal parent of that child by means of a valid gestational agreement. The use of technology to accomplish reproduction by means other than sexual intercourse no longer may be considered "new" science, and, indeed, the legislature has recognized the validity of such agreements.[3] Moreover, no

---

[1] For purposes of this opinion, we use the term "intended parent" to signify a party to a gestational agreement who enters into the agreement with a gestational carrier with the intention of becoming the legal parent of any resulting children.

[2] Throughout this opinion, we use the terms "biological" and "genetic" interchangeably. A "biological parent" or "genetic parent" is a parent who shares genetic material with the child; that is, both phrases refer to parents who have contributed gametes.

[3] The first child conceived by means of in vitro fertilization was born more than thirty years ago, in 1978. M. Garrison, "Law Making for Baby Making: An Interpretive Approach to the Determination of Legal Parentage," 113 Harv. L. Rev. 835, 848 (2000). The famous "Baby M" case was decided in 1988, twenty-two years ago. *In re Baby M.*, 109 N.J. 396, 537 A.2d 1227 (1988). This court stated, more than ten years ago, that neither artificial

one can deny that assisted reproductive technology implicates an essential matter of public policy—it is a basic expectation that our legal system should enable each of us to identify our legal parents with reasonable promptness and certainty. Despite the facts that assisted reproductive technology has been available for some time, and that the technology implicates the important issue of the determination of legal parentage, our laws, and the laws of most other states, have struggled unsuccessfully to keep pace with the complex legal issues that continue to arise as a result of the technology.[4] It is our view that our laws should provide an answer to the following two basic questions: (1) who are the legal parents of children born as a result of such technology; and (2) what steps must such persons take to clarify their status as legal parents of such children? Our answers to these questions are limited by the scope of the question presented on appeal, and, even more

insemination nor surrogate motherhood is "new [or] scientifically advanced." *Doe* v. *Doe*, 244 Conn. 403, 419, 710 A.2d 1297 (1998); id. (artificial insemination dates back to 1770s and surrogate motherhood is recorded in Book of Genesis).

[4] See, e.g., D. Hofman, " 'Mama's Baby, Daddy's Maybe:' A State-by-State Survey of Surrogacy Laws and Their Disparate Gender Impact," 35 Wm. Mitchell L. Rev. 449, 454 (2009) (noting advances in assisted reproductive technology and, in course of fifty state survey, noting that "[t]he vast majority of states are silent or near silent on the issues of whether, when, and how surrogacy agreements are enforceable, void, or voidable"); C. Spivack, "The Law of Surrogate Motherhood in the United States," 58 Am. J. Comp. L. 97, 101 (Sup. 2010) (commenting on confused state of law on surrogacy issue and categorizing different approaches taken by various states, including " 'inaction,' " which describes state legislatures that have failed to ban surrogacy and instead have relied on courts to ban it as matter of public policy); A. Plant, "With a Little Help from My Friends: The Intersection of the Gestational Carrier Surrogacy Agreement, Legislative Inaction, and Medical Advancement," 54 Ala. L. Rev. 639 (2003) (noting law's inability to keep pace with advances in assisted reproductive technology and remarking that gestational agreements "seem beyond the boundaries of settled law, reaching into a morass of issues and rights involving morality, ethics, and responsibility"); see also part II of this opinion (discussing statutes and decisions of other states dealing with legal issues arising from use of assisted reproductive technology).

importantly, by the fact that the broad public policy issues raised by modern reproductive technology and implicated by this appeal more appropriately would be addressed by the legislature. When, as in the present case, however, a statutory scheme is susceptible to an interpretation whereby a child born as a result of a gestational agreement could be deemed to have no legal parent, which rationally could not have been the legislature's intent, the court is bound to interpret the scheme in a manner that confers legal parentage on the intended parents pursuant to the legally valid gestational agreement.

The defendant department of public health (department) appeals from the judgment of the trial court in favor of the plaintiff Shawn Hargon, an intended parent under the gestational agreement.[5] On appeal, the department argues that the trial court lacked subject matter jurisdiction both to terminate the putative parental rights of the gestational carrier, the defendant Karma A. Ramey,[6] and to declare Hargon a legal parent of the children to whom Ramey gave birth, and, consequently, to order the department to issue a replacement birth certificate pursuant to General Statutes § 7-48a,[7] naming

[5] The trial court also rendered judgment for the plaintiff Anthony Raftopol, the children's biological father, but the department does not challenge the judgment with respect to Raftopol. We refer to Raftopol and Hargon individually by name and collectively as the plaintiffs.

[6] Although Ramey and Manchester Memorial Hospital also were named as defendants in the action, neither is a party to this appeal.

[7] General Statutes § 7-48a provides in relevant part: "On and after January 1, 2002, each birth certificate shall be filed with the name of the birth mother recorded. *If the birth is subject to a gestational agreement,* the Department of Public Health shall create a replacement certificate in accordance with an order from a court of competent jurisdiction not later than forty-five days after receipt of such order or forty-five days after the birth of the child, whichever is later. Such replacement certificate shall include all information required to be included in a certificate of birth of this state as of the date of the birth. . . ." (Emphasis added.)

The phrase "[i]f the birth is subject to a gestational agreement" was added to § 7-48a, effective October 1, 2008, by No. 08-184, § 1, of the 2008 Public Acts (P.A. 08-184). Although the trial court in the present case rendered

Hargon and the named plaintiff, Anthony Raftopol, the children's biological father, as the children's parents. The department also argues that the trial court improperly concluded that § 7-48a conferred parental status on Hargon solely on the ground that he was an intended parent and party to a valid gestational agreement.[8] We conclude that the trial court had jurisdiction to issue the declaratory judgment. Moreover, we conclude that the trial court's judgment declaring Hargon to be the parent of the children and ordering the department to

judgment on July 24, 2008, prior to the effective date of the 2008 amendment, the testimony of J. Robert Galvin, the commissioner of public health, before the public health committee on P.A. 08-184 makes clear that the phrase was added as a "clarification" that § 7-48a pertains to "births that are subject to a gestational agreement. Without this revision it is difficult to interpret [the] statute." Conn. Joint Standing Committee Hearings, Public Health, Pt. 2, 2008 Sess., p. 545. The department concedes on appeal that P.A. 08-184 merely clarified that § 7-48a applies to births that are subject to a gestational agreement.

"We presume that, in enacting a statute, the legislature intended a change in existing law. . . . This presumption, like any other, may be rebutted by contrary evidence of the legislative intent in the particular case. An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act. . . . Furthermore, an amendment that is intended to clarify the intent of an earlier act necessarily has retroactive effect." (Internal quotation marks omitted.) *Middlebury* v. *Dept. of Environmental Protection*, 283 Conn. 156, 172–74, 927 A.2d 793 (2007). Because the 2008 amendment was merely a clarification of existing law, it represents the meaning of the original act. Accordingly, in our interpretation of § 7-48a, we rely on the language that became effective as of October 1, 2008.

[8] Although the trial court did not expressly state in its memorandum of decision that § 7-48a created parentage in Hargon by virtue of the gestational agreement, it stated that it had arrived at its judgment after considering, inter alia, the trial court's decision in *Griffiths* v. *Taylor*, Superior Court, judicial district of Waterbury, Docket No. FA08-4015629 (June 13, 2008), which concluded that the legislature intended, through § 7-48a, to "[create] yet another statutory manner in which parentage can be established: by being named as an intended parent in a gestational carrier agreement. The legislative history of § 7-48a clearly evinces that the legislature contemplated that intended parents, irrespective of whether they are biologically related to the unborn child, can be adjudged the parents of the child pursuant to the gestational carrier agreement and be named as the parents of a child on a replacement birth certificate by the [department]."

place his name on the replacement birth certificate is supported by the applicable statutes. Accordingly, we affirm the judgment of the trial court.

The record reflects the following facts, either as found by the trial court or undisputed. The plaintiffs, who were domestic partners living in Bucharest, Romania,[9] entered into a written agreement (gestational agreement), dated July 29, 2007, with Ramey, in which she agreed to act as a gestational carrier[10] for the plaintiffs. Pursuant to the gestational agreement, eggs were recovered from a third party egg donor and fertilized with sperm contributed by Raftopol. Three of the resulting frozen embryos were subsequently implanted in Ramey's uterus. As a result of the procedures, Ramey gave birth to two children on April 19, 2008.[11] DNA testing confirmed that Raftopol was the biological father of the children. Pursuant to the gestational agreement, Ramey had agreed to terminate her parental rights to any children resulting from the procedures, and to sign any forms necessary for the issuance of a replacement birth certificate naming the plaintiffs as the parents of such children. Ramey also had agreed to consent to the adoption of any such children by Hargon and to cooperate fully to obtain this goal.[12]

---

[9] Although it has no bearing on the outcome of this appeal, the plaintiffs subsequently were married in Massachusetts on August 15, 2008.

[10] For purposes of this opinion, we use the term "gestational carrier" to refer to an adult woman who gives birth, pursuant to a gestational agreement, to a child to whom she bears no biological relation. In other words, "gestational carrier" signifies a woman who supplies only a womb and not the egg. In this opinion, the term "gestational carrier" does not include a woman who requests the use of artificial insemination with donor eggs pursuant to General Statutes §§ 45a-771a through 45a-775. Nor does the term "gestational carrier" refer to a traditional surrogate who is genetically related to the child, that is, a woman who agrees to be artificially inseminated with the sperm of either the intended father or a donor, and to relinquish her parental rights.

[11] The children were born three months prematurely.

[12] Ramey previously had given birth to another child for the plaintiffs, under the same conditions. That is, Ramey had entered into a gestational agreement with the plaintiffs, who utilized the same third party egg donor and

Prior to the expected delivery date, the plaintiffs brought this action, seeking a declaratory judgment that the gestational agreement was valid, that the plaintiffs were the legal parents of the children and requesting that the court order the department to issue a replacement birth certificate reflecting that they, and not Ramey, were parents of the children. The department responded that the court lacked jurisdiction over the matter because Hargon did not allege that he had conceived the children and because the court lacked jurisdiction to terminate the parental rights of the gestational carrier, the egg donor, and any husbands either may have, which the department argued would be a necessary prerequisite to the declaration that Hargon is a parent of the children.[13] Finally, the department contended that the allegations of the complaint did not sufficiently establish the paternity of the children. Following a hearing, the trial court issued a ruling declaring that: (1) the gestational agreement is valid;[14] (2) Raftopol is the genetic and legal father of the children; (3) Hargon is the legal father of the children; and (4) Ramey is not the genetic or legal mother of the children. The court therefore ordered the department to issue a replacement birth certificate pursuant to § 7-48a. This appeal followed.[15]

Raftopol's sperm to create an embryo, which subsequently was implanted in Ramey's uterus. Hargon, along with Raftopol, had been named as the parent on the replacement birth certificate, with no objection from the department.

[13] The department does not renew on appeal the argument it had raised to the trial court that the termination of the parental rights of the egg donor and any husband of the egg donor would be necessary in order for Hargon to acquire parental status with respect to the children. In any case, such an argument would fail in light of General Statutes § 45a-775, which provides: "An identified or anonymous donor of sperm or eggs used in A.I.D. [artificial insemination with donor sperm or eggs], or any person claiming by or through such donor, shall not have any right or interest in any child born as a result of A.I.D."

[14] The department does not challenge on appeal the trial court's conclusion that the gestational agreement was valid.

[15] The department appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

## I

We first turn to the issue of whether the trial court lacked subject matter jurisdiction to declare Hargon a legal parent of the children because Hargon was not biologically related to the children and did not adopt them. Included within this issue is the question of whether the court was required, as a prerequisite to making any determination regarding Hargon's parental status, to terminate Ramey's parental rights, and, if so, whether the court had jurisdiction to terminate those rights. We conclude that: (1) because Ramey did not have any parental rights with respect to the children, the termination of those nonexistent rights was not a necessary prerequisite to a determination of Hargon's parental status with respect to the children; and (2) the court had jurisdiction to issue a declaratory ruling regarding Hargon's parental status.

## A

Preliminarily, we address the department's claim that the trial court lacked subject matter jurisdiction to declare Hargon a parent because the termination of Ramey's parental rights—over which the trial court would have lacked jurisdiction—was a necessary prerequisite to Hargon's acquiring parental status with respect to the children.[16] "[O]nce the question of lack

[16] It is well established that there exist only two procedural vehicles by which parental rights may be terminated: "[B]y decree of the [P]robate [C]ourt pursuant to General Statutes § 45-61c (b) [now codified at General Statutes § 45a-715] or by decree of the juvenile division of the Superior Court in a proceeding brought by the commissioner of children and youth services [now the commissioner of children and families] under [General Statutes] § 17-43a [now codified at General Statutes § 17a-112]." *Hao Thi Popp* v. *Lucas*, 182 Conn. 545, 550, 438 A.2d 755 (1980). This action was not initiated by the commissioner of children and families pursuant to § 45a-715. Accordingly, only the Probate Court would have had jurisdiction to terminate any parental rights Ramey might have possessed. Id., 549–50 (concluding that trial court lacked jurisdiction to terminate plaintiff mother's parental rights because action did not comply with either available procedural vehicle).

of jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case." (Internal quotation marks omitted.) *Golden Hill Paugussett Tribe of Indians* v. *Southbury*, 231 Conn. 563, 570, 651 A.2d 1246 (1995). Because Ramey had no parental rights to terminate, we conclude that the trial court was not deprived of jurisdiction.

Our statutes and case law establish that a gestational carrier who bears no biological relationship to the child she has carried does not have parental rights with respect to that child. We have long recognized that there are three ways by which a person may become a parent: conception, adoption or pursuant to the artificial insemination statutes.[17] See, e.g., *Doe* v. *Doe*, 244 Conn. 403, 435, 710 A.2d 1297 (1998); *Remkiewicz* v. *Remkiewicz*, 180 Conn. 114, 116–17, 429 A.2d 833 (1980). The definitional section of chapter 803 of the General Statutes, which deals with termination of parental rights and adoption, defines " '[p]arent' " as "a biological or adoptive parent . . . ." General Statutes § 45a-707 (5). The same definitional section defines " '[t]ermination of parental rights' " as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's *parent* or *parents* . . . ." (Emphasis added.) General Statutes § 45a-707 (8). Reading these two subdivisions of the same statute together suggests that only persons who are biological or adoptive parents have parental rights with respect to the subject children.

---

[17] We have never stated, and do not hold today, that being named on a birth certificate as the parent to the child confers parental status on the named person. A person who is named on a birth certificate as a parent to the child is so named on the certificate as a function of the department's responsibility to keep accurate records of vital records. The birth certificate must accurately reflect the legal relationship between parent and child, but it does not create that relationship. See footnote 27 of this opinion.

In 1975, the legislature provided the third means by which a person may gain parental status. Public Acts 1975, No. 75-233, now codified at General Statutes § 45a-774. Section 45a-774 provides: "Any child or children born as a result of A.I.D. shall be deemed to acquire, in all respects, the status of a naturally conceived legitimate child of the husband and wife who consented to and requested the use of A.I.D." " 'A.I.D.' " is defined as "artificial insemination with the use of donated sperm or eggs from an identified or anonymous donor." General Statutes § 45a-771a (2). " 'Artificial insemination' " is specifically defined to include both "intrauterine insemination and in vitro fertilization . . . ." General Statutes § 45a-771a (1). Accordingly, a child born to a married woman and conceived through artificial insemination by an egg or sperm donor is the child of the wife and husband who requested and consented to the use of A.I.D.[18]

[18] Chapter 803a, General Statutes §§ 45a-771 through 45a-779, governs children conceived through artificial insemination. Nothing in this chapter mentions gestational carriers or suggests that the legislature intended the artificial insemination statutes to resolve legal parentage questions arising from the use of a gestational carrier. Rather, the statutory scheme presumes, without expressly stating, that its scope is limited to children who are born to a married woman who has either requested or consented to the use of artificial insemination. That presumption is expressed in General Statutes § 45a-771 (a), which declares "that the public policy of this state has been an adherence to the doctrine that every child *born to a married woman during wedlock is legitimate.*" (Emphasis added.) Although the process of in vitro fertilization is included within the definition of artificial insemination, the fact that it is presumed that any resulting embryo will be implanted in the womb of the wife is evidenced by General Statutes § 45a-772 (b), which provides: "A.I.D. shall not be performed unless the physician receives in writing the request and consent of the husband and wife desiring the utilization of A.I.D. for the purpose of conceiving a child or children." No third party involvement, other than egg or sperm donors, is contemplated. Similarly, § 45a-774 references the request and consent of the husband and wife, without suggesting any third party involvement beyond the gamete donors.

Finally, General Statutes § 45a-776 considers the domicile of a child born as a result of the use of A.I.D. and provides that: "(a) Any child conceived as a result of A.I.D. performed in Connecticut and born in another jurisdiction shall have his status determined by the law of the other jurisdiction unless

Our decisions prior to the passage of § 7-48a confirm that these three avenues were the exclusive means by which a person could acquire parental status. The question of the meaning of the term parent has most commonly arisen in the context of dissolution actions, when the parties have raised claims relating to custody or support. For example, in *Remkiewicz* v. *Remkiewicz*, supra, 180 Conn. 120, the attorney general sought an order compelling the defendant husband to pay support for his wife's minor child, Jennifer, who was not the defendant's biological child.[19] Three years prior to the dissolution action, the husband had filed an affidavit of parentage, seeking to change Jennifer's birth certificate to list himself as her father and her name as Jennifer Remkiewicz. Id., 116. In affirming the judgment of the trial court denying the motion for an order of support,[20] we framed the issue as "whether the court had any authority to issue such an order as against a husband who was neither the biological nor adoptive parent of the child for whom support was sought." Id., 116–17.

the mother of the child is domiciled in Connecticut at the time of the birth of the child.

"(b) If a child is conceived by A.I.D. in another jurisdiction but is born in Connecticut to a husband and wife who, at the time of conception, were not domiciliaries of Connecticut, but are domiciliaries at the time of the birth of the child, the child shall have the same status as is provided in section 45a-774, even if the provisions of subsection (b) of section 45a-772 and section 45a-773 may not have been complied with." Section 45a-776 does not address any issues that may arise with respect to the domicile of a gestational carrier. The consistent presumption within the entire statutory scheme is that any of the technologies included within the meaning of " '[a]rtificial insemination' " will result in the wife being the birth mother.

[19] Because the wife had been receiving state assistance for herself and her child, the attorney general became a party to the action and moved for support pursuant to General Statutes § 46-63, now codified at General Statutes § 46b-55. *Remkiewicz* v. *Remkiewicz*, supra, 180 Conn. 115.

[20] The trial court had denied the motion for an order of support on the ground that it lacked jurisdiction. *Remkiewicz* v. *Remkiewicz*, supra, 180 Conn. 116. Although we concluded that jurisdiction was not a bar to the issuance of the support order, we affirmed the judgment on alternate grounds. Id., 116 n.3.

We began with the proposition that the duty to support "is one imposed on parents." Id., 117. We concluded that the defendant was not Jennifer's legal father because he was not her biological father, had not been adjudicated so in a paternity proceeding, and had not adopted her. Id. This rule, we reasoned, was consistent with the legislative intent expressed in the statutory scheme for adoption; see General Statutes c. 803; namely, that "no person shall acquire parental status unless certain formalities are observed. . . . If a stepfather could acquire parental rights through the simple expedient of changing his stepchild's birth certificate, all sorts of mischief could result." *Remkiewicz* v. *Remkiewicz*, supra, 120.

In *Doe* v. *Doe*, supra, 244 Conn. 435, 447, we reaffirmed the principle that, under the then existing statutory scheme, parentage could arise only by conception, adoption, or by way of the artificial insemination statutes. *Doe* involved a custody dispute within a dissolution action and concerned the defendant father's biological child, who was conceived by impregnating a surrogate with his sperm through a syringe.[21] Id., 410. Although the child, who was fourteen at the time of the appeal, was neither the plaintiff's biological nor adopted child, both parties had raised her together as their daughter.[22] Id., 405, 411. The trial court had concluded that it lacked jurisdiction over the custody dispute because the child was not a " 'child of the marriage . . . .' " Id., 413, 422. We disagreed. Although we concluded that the concept embodied by " 'child of the

[21] By contrast with the present case, therefore, the facts in *Doe* involved a traditional surrogacy. See footnote 10 of this opinion. Because the surrogate was impregnated without the use of a donated egg, she was the biological mother of the child. Her parental rights and the parental rights of her former husband had been terminated by decree of the Probate Court. *Doe* v. *Doe*, supra, 244 Conn. 409.

[22] The parties were married when the surrogate was four months pregnant with the child. *Doe* v. *Doe*, supra, 244 Conn. 411.

marriage' " remained an implicit part of the statutory scheme governing dissolution, we concluded that the concept no longer imposed *jurisdictional* limitations on the trial court with respect to custody disputes. Id., 422. Having determined that we had jurisdiction over the custody dispute, we turned to the question of whether the plaintiff was entitled to claim a right to custody of the child by virtue of being her parent. Recognizing that "[t]he child of the marriage and the parent of the child are two sides of the same coin"; id., 439; we concluded that the plaintiff was not a parent of the child. Id., 442. Although the term " 'child of the marriage' " had not been expressly defined in our statutes, we stated that its meaning was "limited to a child conceived by both parties, a child adopted by both parties, a child born to the wife and adopted by the husband, a child conceived by the husband and adopted by the wife, and a child born to the wife and conceived through artificial insemination by a donor pursuant to [General Statutes] §§ 45a-771 through 45a-779." Id., 435. Under that definition, because the plaintiff was not the birth mother, bore no biological relationship to the child, had not adopted the child and was not the mother of the child by virtue of the artificial insemination statutes, she was not the child's parent. Id., 442.

Under any of the three specified ways of acquiring parental status, as set forth both in our statutes and interpretive case law, Ramey is not a parent of the children in the present case. It is undisputed that she is neither the biological nor the adoptive mother to the children. Nor does she fall within the parameters of the artificial insemination statutes. Accordingly, Ramey did not have parental rights that required termination before Hargon could acquire parental status with respect to the children.

## B

The department also claims that the trial court lacked jurisdiction to declare Hargon a parent. Specifically, the department argues that, because a person may become a parent only by conception, adoption, or by compliance with our statutes governing artificial insemination, and because Hargon does not claim parentage by virtue of any of these three avenues, the trial court lacked jurisdiction to consider Hargon's request for a declaratory judgment that he is the parent of the children. We conclude that the trial court had jurisdiction over the matter.

"Where a decision as to whether a court has subject matter jurisdiction is required, every presumption favoring jurisdiction should be indulged." *Demar* v. *Open Space & Conservation Commission*, 211 Conn. 416, 425, 559 A.2d 1103 (1989). We often have stated that "the Superior Court is a court of general jurisdiction." *Carten* v. *Carten*, 153 Conn. 603, 612, 219 A.2d 711 (1966). "Article fifth, § 1 of the Connecticut constitution proclaims that [t]he powers and jurisdiction of the courts shall be defined by law, and General Statutes § 51-164s provides that [t]he Superior Court shall be the sole court of original jurisdiction for all causes of action, except such actions over which the courts of probate have original jurisdiction, as provided by statute." (Internal quotation marks omitted.) *State* v. *Lawrence*, 281 Conn. 147, 153, 913 A.2d 428 (2007). "[T]he general rule of jurisdiction . . . is that nothing shall be intended to be out of the jurisdiction of a Superior Court but that which specially appears to be so; and . . . nothing shall be intended to be within the jurisdiction of an inferior court but that which is expressly so alleged. . . . [N]o court is to be ousted of its jurisdiction by implication." (Internal quotation marks omitted.) *Carten* v. *Carten*, supra, 612–13.

Pursuant to General Statutes § 52-29, the declaratory judgment statute,[23] Hargon sought a determination that he was the parent of the children. The department appears to argue that because Hargon was not the genetic parent of the children, and because the trial court would have lacked jurisdiction to preside over adoption proceedings, the court lacked jurisdiction to issue a declaration of law as to Hargon's legal status with respect to the children. It is true that the Superior Court lacks jurisdiction over adoption proceedings, which are within the original jurisdiction of the Probate Court. See General Statutes §§ 45a-727 (a) (1),[24] 46b-1 (14)[25] and 46b-121 (a) (1).[26] There were, however, no adoption proceedings before the trial court in the present case. Hargon sought a declaration that he had acquired parental status by virtue of the gestational

[23] General Statutes § 52-29 provides: "(a) The Superior Court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. The declaration shall have the force of a final judgment.

"(b) The judges of the Superior Court may make such orders and rules as they may deem necessary or advisable to carry into effect the provisions of this section."

[24] General Statutes § 45a-727 (a) (1) provides: "Each adoption matter shall be instituted by filing an application in a Court of Probate, together with the written agreement of adoption, in duplicate. One of the duplicates shall be sent immediately to the Commissioner of Children and Families."

[25] General Statutes § 46b-1 provides in relevant part: "Matters within the jurisdiction of the Superior Court deemed to be family relations matters shall be matters affecting or involving . . . (14) appeals from probate concerning: (A) Adoption or termination of parental rights . . . ."

[26] General Statutes § 46b-121 (a) (1) provides: "Juvenile matters in the civil session include all proceedings concerning uncared-for, neglected or dependent children and youths within this state, termination of parental rights of children committed to a state agency, matters concerning families with service needs, contested matters involving termination of parental rights or removal of guardian transferred from the Probate Court and the emancipation of minors, *but does not include matters of* guardianship and *adoption* or matters affecting property rights of any child or youth over which the Probate Court has jurisdiction, except that appeals from probate concerning adoption, termination of parental rights and removal of a parent as guardian shall be included." (Emphasis added.)

agreement and § 7-48a, despite the fact that he had *not* adopted the children. In other words, Hargon sought a declaration that § 7-48a creates a fourth means by which he had gained parental status, independent of and in addition to conception, adoption, or the artificial insemination statutes. The department appears to argue that, because the trial court would have lacked subject matter jurisdiction to preside over adoption proceedings instituted by Hargon, we should infer that the court lacked jurisdiction over any alternate claim that Hargon might advance in support of his legal parentage of the children. Put another way, the department asks us to infer that, because the Probate Court has original jurisdiction over adoption proceedings, it has original jurisdiction over all claims to parentage, except for claims advanced by persons who are the biological parents. This inference would conflict with our established rules that we will not oust the Superior Court of jurisdiction by implication and we will not enlarge the jurisdiction of the Probate Court beyond that which is expressly committed to it by statute. *Carten* v. *Carten,* supra, 153 Conn. 613–14. The declaration of law sought by Hargon required the trial court to engage in a statutory interpretation of § 7-48a to determine whether that statute creates an alternate means, in addition to and separate from the three existing means, by which a nongenetically related, intended parent may attain legal parentage. That determination lies within the jurisdiction of the Superior Court. Thus, the Superior Court is "a court of competent jurisdiction" within the meaning of § 7-48a.

## II

The jurisdictional questions now resolved, we turn to the merits of the department's claim that the trial court improperly concluded that § 7-48a conferred parental status on Hargon by virtue of the gestational agreement. The plaintiffs contend that § 7-48a evi-

dences a legislative recognition of the validity of intended parentage. Accordingly, they claim that, pursuant to § 7-48a, a court of competent jurisdiction may declare Hargon to be the parent of the children, and, consistent with that declaratory ruling, may order the department to issue a replacement birth certificate reflecting his parental status. The department claims that the legislature intended that § 7-48a would allow only intended parents who are also the genetic parents of the children to gain legal parental status without first adopting the children. We conclude that § 7-48a allows an intended parent who is a party to a *valid* gestational agreement to become a parent without first adopting the children, without respect to that intended parent's genetic relationship to the children. Consistent with that conclusion, we conclude that the trial court properly ordered the department to issue a replacement birth certificate listing Hargon as parent of the children. We emphasize that the court's order to the department to place Hargon's name on the replacement birth certificate *follows from* its declaratory judgment concluding that Hargon is a parent to the children. No one should misunderstand this opinion to state that the department, by placing Hargon's name on the replacement birth certificate, or by refusing to do so, confers or declines to confer parental status on Hargon. In this particular case, that relationship was created by the valid gestational agreement, and that relationship is accurately reflected by naming Hargon as a parent to the children on the replacement birth certificate. A birth certificate is a vital record that must accurately reflect legal relationships between parents and children—it does not create those relationships. General Statutes §§ 19a-40 and 19a-42; see footnotes 33 and 34 of this opinion.

Preliminarily, we must note that because in the present case the department has not challenged the trial

court's finding that the gestational agreement at issue is valid, that issue has not been presented to us. See footnote 14 of this opinion. Accordingly, our analysis is predicated on this important starting point: we assume without deciding that the gestational agreement at issue is valid. The question of whether § 7-48a allows a nonbiological intended parent to acquire parental status through a valid gestational agreement without first adopting the children presents a question of statutory interpretation, over which we exercise plenary review. *Ziotas* v. *Reardon Law Firm, P.C.*, 296 Conn. 579, 587, 997 A.2d 453 (2010). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine the meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes." (Internal quotation marks omitted.) Id. Specifically, § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Ziotas* v. *Reardon Law Firm, P.C.*, supra, 587.

As directed by § 1-2z, we begin with the text of the statute. Section 7-48a provides in relevant part: "On and after January 1, 2002, each birth certificate shall be filed with the name of the birth mother recorded. *If the birth is subject to a gestational agreement,* the Department of Public Health shall create a replacement certificate in accordance with an order from a court of competent

jurisdiction not later than forty-five days after receipt of such order or forty-five days after the birth of the child, whichever is later. Such replacement certificate shall include all information required to be included in a certificate of birth of this state as of the date of the birth. . . ." (Emphasis added.) What is clear from the text of the statute is that if the birth is subject to a "gestational agreement" and if a court of competent jurisdiction orders the department to do so, the department is both authorized and required to issue a replacement birth certificate in accordance with that order. It follows that, because some gestational agreements would justify a court order to the department to issue a replacement birth certificate, at least some gestational agreements are valid under Connecticut law. Beyond that, however, the statutory text gives rise to numerous ambiguities. For example, although § 7-48a initially provides that the name of the birth mother shall be placed on the birth certificate, it does not define the term "birth mother . . . ."[27] Nor, more significantly, does § 7-48a define the key phrase, "gestational agreement . . . ."[28]

[27] Because the initial requirement—that each birth certificate shall be filed with the name of the birth mother recorded—applies to every birth, not just births governed by gestational agreements, it appears that the term "birth mother" refers to any woman who gestates and gives birth to a child, regardless of whether she is also the genetic mother to the child. Considering that a gestational carrier—that is, a birth mother who is not also the genetic mother—has no parental rights; see part I A of this opinion; and considering also the requirement that all information on birth certificates must be accurate; General Statutes §§ 19a-40 and 19a-42; see footnotes 33 and 34 of this opinion; it would be helpful if the legislature clarified that it does indeed intend through § 7-48a to require that the name of a woman who has no parental status with respect to the child must be listed on the birth certificate as the mother, despite the apparent conflict with §§ 19a-40 and 19a-42.

[28] "[G]estational agreement" may encompass a variety of different arrangements. The possibilities include, but are not limited to the following: a traditional surrogacy arrangement in which the surrogate, whose own eggs are used, is impregnated via artificial insemination with the sperm of the intended father or a donor; a purely gestational agreement, whereby the sperm of the intended father and the egg of the intended mother are used to create an embryo which is implanted in the gestational carrier's uterus; a third party egg donor gestational agreement, such as the one in the present

Section 7-48a says nothing about the nature and scope of the court order. It is, therefore, not clear whether § 7-48a sets forth merely procedural guidelines or effects a substantive change in the law. In other words, it is possible that the "court order" contemplated by the statute is merely a ministerial order for the issuance of a replacement birth certificate. It is also possible that § 7-48a effects a substantive change in the law, creating a new means by which a person may become a parent, thus justifying an order declaring parentage. That is, does § 7-48a contemplate, as happened in the present case, a court issuing a declaratory judgment that the intended parents are, by virtue of the gestational agreement, legal parents, and an order consistent with that judgment directing the department to issue the replacement birth certificate? Additionally, § 7-48a does not set forth any guidelines as to who may qualify, and by what means, to be named as a parent on a replacement birth certificate.[29] In other words, it is unclear from the text of § 7-48a: (1) which types of gestational agreements are intended to be included within the statutory phrase "gestational agreement"; (2) whether a court may order the department to issue a replacement birth certificate naming an intended parent as the parent, despite the fact that the intended parent is the parent neither by conception nor adoption; and

case, in which the sperm of the intended father and the egg of a third party, identified or unidentified, egg donor are used to create an embryo, which is implanted in the gestational carrier's uterus; or a third party sperm and egg donor gestational agreement, in which neither the sperm nor the egg come from the intended parents, and the resulting embryo is implanted in the gestational carrier's uterus.

[29] Moreover, because there is no statutory provision specifically addressing the elements of a valid gestational agreement, and because the reference to gestational agreements in § 7-48a is merely a passing one, the statutory scheme provides no guidelines as to what constitutes a *valid* gestational agreement, which, presumably, would be the only type of gestational agreement that would justify a court to order the department to issue a replacement birth certificate.

(3) whether the statute creates a new means by which persons may become legal parents.

Related statutes provide little guidance in resolving the many ambiguities suggested by the text of § 7-48a. Although the phrase "gestational agreement" appears in three related statutes within chapter 93 of the General Statutes, which governs registrars of vital statistics, the phrase is not defined in any of those provisions. The definition section of that chapter unhelpfully defines " '[p]arentage' " as including "matters relating to adoption, gestational agreements, paternity and maternity . . . ." General Statutes § 7-36 (13). The broad wording of that definition does not clarify the meaning of "gestational agreement" or provide guidance as to who may be named as a parent on a replacement birth certificate pursuant to § 7-48a. The remaining two references to "gestational agreements" are in General Statutes §§ 7-51 and 7-51a, which establish rules governing access to vital records. Both of those statutes limit access to confidential files containing, inter alia, information regarding gestational agreements.[30] Neither statute clarifies the types of gestational agreements included within the term "gestational agreement" or provides guidance as to the effect of such agreements on parental rights.

[30] Specifically, § 7-51, which governs access to vital records, provides in relevant part: "(a) . . . Except as provided in section 19a-42a, access to confidential files on paternity, adoption, gender change or *gestational agreements*, or information contained within such files, shall not be released to any party, including the eligible parties listed in this subsection, except upon an order of a court of competent jurisdiction. . . ." (Emphasis added.)

Section 7-51a, which governs access to vital records by genealogical societies, provides in relevant part: "(a) . . . During all normal business hours, members of genealogical societies incorporated or authorized by the Secretary of the State to do business or conduct affairs in this state shall (1) have full access to all vital records in the custody of any registrar of vital statistics, including certificates, ledgers, record books, card files, indexes and database printouts, except for those records containing Social Security numbers protected pursuant to 42 USC 405 (c) (2) (C), and confidential files on adoptions, gender change, *gestational agreements* and paternity . . . ." (Emphasis added.)

We observe that in interpreting the text of § 7-48a, we write on a clean slate. This court has not previously construed this statute. Compare *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 496, 923 A.2d 657 (2007) (recognizing that in interpreting statutory language that had been construed in earlier decisions, court was not writing on "clean slate" and relying on prior judicial interpretations to construe statute's plain meaning). Although *Doe* v. *Doe*, supra, 244 Conn. 403, and *Remkiewicz* v. *Remkiewicz*, supra, 180 Conn. 114, address related issues, both cases were decided prior to the passage of § 7-48a, and, therefore, those decisions do not provide helpful guidance in discerning the meaning and scope of § 7-48a. In the absence of such interpretive tools, we conclude that the plain language of § 7-48a does not unambiguously indicate whether the legislature intended § 7-48a to authorize the Superior Court to declare an intended parent who bears no biological relationship to a child to be a legal parent of that child absent adoption proceedings.

Moreover, the department's contention that the *only* reasonable interpretation of the plain language of § 7-48a is that only biological intended parents may gain legal parental status solely by virtue of being parties to a valid gestational agreement, runs afoul of a basic principle of statutory construction. We often have stated that "it is axiomatic that those who promulgate statutes . . . do not intend to promulgate statutes . . . that lead to absurd consequences or bizarre results." (Internal quotation marks omitted.) *State* v. *Courchesne*, 296 Conn. 622, 710, 998 A.2d 1 (2010); see also *Dias* v. *Grady*, 292 Conn. 350, 361, 972 A.2d 715 (2009). Accordingly, "[w]e construe a statute in a manner that will not . . . lead to absurd results." (Internal quotation marks omitted.) *Kelly* v. *New Haven*, 275 Conn. 580, 616, 881 A.2d 978 (2005). The department's contention that the legislature expressed an intent, via the

plain language of § 7-48a, that only a biological intended parent may gain parental status absent adoption proceedings, when examined in relation to the artificial insemination statutes, leads to the not very remote possibility of a child who comes into the world with no parents—a parentless child. Specifically, General Statutes § 45a-775 provides: "An identified or anonymous donor of sperm or eggs used in A.I.D., or any person claiming by or through such donor, shall not have any right or interest in any child born as a result of A.I.D." As we previously have noted, the definitional section defines " 'A.I.D.,' " or " '[a]rtificial insemination with donor sperm or eggs' " to include in vitro fertilization. General Statutes § 45a-771a. Thus, neither an egg or sperm donor, nor their spouses, if any, gain parental status by virtue of the contribution of gametes for use in in vitro fertilization. Furthermore, as we already have set forth in part I A of this opinion, a gestational carrier who is a party to a valid gestational agreement does not have any parental rights. A corollary to this conclusion is that any spouse of the gestational carrier similarly would not acquire parental status by virtue of a valid gestational agreement. Following this process of elimination, it takes little imagination to visualize the absurd consequence. Suppose an infertile couple who desire to have children but cannot supply the womb, the eggs, or the sperm—a scenario far more likely than the hypothetical imaginary horrible. These intended parents would need to rely on third party egg and sperm donors to produce embryos that are implanted in a gestational carrier pursuant to a gestational agreement. If § 7-48a confers parental status only on biological intended parents, the intended parents are not the parents of any resulting child, nor are the gestational carrier, any spouse she may have, the gamete donors, or any spouses each may have. Every possible parent to the child would be eliminated as a matter of law, yield-

ing the result of a child who is born parentless, not due to the death of the parents, but simply due to elimination by operation of law.[31] The legislature cannot be presumed to have intended this consequence, which is so absurd as to be Kafkaesque. Thus, our examination of the language of the statute pursuant to § 1-2z yields only ambiguity and the department's interpretation of the language of the statute leads to an absurd result. The mere fact, however, that the department's proposed interpretation of § 7-48a leads to an absurd result does not necessarily lead to the conclusion, based on the language of the statute, that § 7-48a confers parental status on Hargon by virtue of the gestational agreement. As we have explained, there are many ambiguities in § 7-48a—the nature and scope of "an order from a court of competent jurisdiction," the types of gestational agreements that would give rise to such an order, whatever it may be, who may be an intended parent, just to name a few. In light of the many remaining ambiguities, we turn to extratextual sources in order to discern the intent of the legislature.

Section 7-48a initially was enacted by No. 01-163, § 28, of the 2001 Public Acts (P.A. 01-163), and, at the time of passage, provided merely: "On and after January 1, 2002, each birth certificate shall contain the name of the birth mother, *except by the order of a court of competent jurisdiction.*" (Emphasis added.) The raised bill that preceded P.A. 01-163 had been much more detailed, and provided in relevant part: "(a) On receipt of a certified copy of an order of a court of competent

---

[31] Not only does this interpretation of § 7-48a lead to an absurd result, it also would be contrary to the best interests of the child doctrine. For instance, if intended parents who bear no biological relationship to the child seek to adopt, who has the authority to offer the child in adoption? It appears that the only option, at least initially, would be to have the commissioner of children and families appointed as the statutory parent of the child. We have found no authority for appointing the commissioner as statutory parent in such cases.

jurisdiction approving a gestational agreement, the department shall prepare a new birth certificate for the child born of the agreement. The new birth certificate shall include all the information required to be set forth in a certificate of birth of this state as of the date of birth, *except that the intended parent or parents under this agreement shall be named as the parent or parents. . . .*" (Emphasis added.) Raised Bill No. 6569, January 2001 Sess., § 27. Thus, although the original language specifically had provided that an intended parent's name should be placed on the replacement birth certificate, that language was omitted from the final language in P.A. 01-163 that was codified at § 7-48a. During discussion of the amendment during House proceedings, Representative Mary U. Eberle remarked on the omission of the original language, observing: "This amendment makes a number of technical corrections and changes . . . *and* it removes the language on gestational agreements and simply substitutes the requirement that the mother on the birth certificate shall be the birth mother unless—except by order of a court of competent jurisdiction." (Emphasis added.) 44 H.R. Proc., Pt. 11, 2001 Sess., p. 3719. Representative Eberle's remarks indicate that the amendment, in addition to and separate from certain technical changes, deleted the language that had referred to gestational agreements and had provided that intended parents be named as parents on replacement certificates. The omission of this language in the raised bill suggests one of two possibilities: (1) the legislature considered, then rejected, the notion of parenthood created solely by intent; or (2) the legislature left it to the courts to decide what additional information the department could be ordered to place on birth certificates.

Section 7-48a was amended in 2004 to add language requiring the department to issue a replacement birth certificate in accordance with an order from a court of

competent jurisdiction.[32] Public Acts 2004, No. 04-255, § 28. Representative Donald B. Sherer offered some background on the amendment during the floor discussion of the bill, observing: "A number of years ago . . . this legislature changed the birth certificate registration law to permit a court of [competent jurisdiction] being the Superior Court to find parentage *in accordance with the biological relationship to a child* rather than the birth mother if she wasn't the biological mother." (Emphasis added.) 47 H.R. Proc., Pt. 14, 2004 Sess., pp. 4456–57. Although Representative Sherer did not directly state that the finding of parentage contemplated by § 7-48a could be confined to those intended parents who share a biological relationship with the children, but are not the birth parents, his remark does provide some support for that interpretation.

A subsequent exchange could be read more broadly. At one point during the discussion of the amendment, Representative Lenny T. Winkler remarked: "[F]rom what I understand it's been difficult for some individuals to adopt and they've been required to go to [P]robate [Court] and this would avoid that and make it easier, could you explain that all?" Id., p. 4459. Representative Sherer responded: "That's correct. There's been the difficult situation where due to the birth being, the parents not being the birth parents the only way to obtain a new birth certificate would be to go to [P]robate [C]ourt and basically adopt their own child, which no one really thinks is the right thing to do." Id. This

---

[32] Section 28 of No. 04-255 of the 2004 Public Acts provides in relevant part: "Section 7-48a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

"On and after January 1, 2002, each birth certificate shall contain the name of the birth mother, except by the order of a court of competent jurisdiction, and be filed with the name of the birth mother recorded. Not later than forty-five days after receipt of an order from a court of competent jurisdiction, the Department of Public Health shall create a replacement certificate in accordance with the court's order. . . ." (Emphasis in original.)

exchange indicates that the legislature was focused on allowing nonbirth parents, which could include the intended parents under a gestational agreement, to circumvent Probate Court. The exchange leaves open the possibility that the legislature intended that nonbiological intended parents would benefit from the rule. Both exchanges also clarify one ambiguity in § 7-48a. Sherer stated that the "court of [competent jurisdiction]"; id., 4456–57; referred to in the statute is the Superior Court, and that the intent of the statute is to circumvent proceedings in the Probate Court because of the difficulty some parties to gestational agreements had encountered in adopting. Id., 4459. This legislative history clarifies that § 7-48a does not merely provide for a ministerial order by a court, but rather, has effected a substantive change in the law and has created a new way by which persons may become legal parents.

With respect to whether this substantive change in the law was intended to include nonbiological intended parents, we recognize that the legislative history is inconclusive, but we already have rejected, on the basis of our plain language analysis, the department's contention that only biological intended parents may acquire legal parentage solely by virtue of a valid gestational agreement. On the basis of our analysis of both the text of the statute, as well as its legislative history, we conclude that the legislature intended § 7-48a to confer parental status on an intended parent who is a party to a valid gestational agreement irrespective of that intended parent's genetic relationship to the children. Such intended parents need not adopt the children in order to become legal parents. They acquire that status by operation of law, upon an order by a court of competent jurisdiction pursuant to § 7-48a.

Consistent with our conclusion that § 7-48a confers parental status on a nongenetic, intended parent who is a party to a valid gestational agreement, we also

conclude that the trial court properly ordered the department to issue a replacement birth certificate listing Hargon as a parent of the children. This conclusion is also consistent with the principle that information on a birth certificate must be accurate. See General Statutes §§ 19a-40[33] and 19a-42;[34] *In re Michaela Lee R.*, 253 Conn. 570, 572, 756 A.2d 214 (2000) (Probate Court did not have authority to delete biological parent's name from birth certificate without allegation that information was inaccurate).

The department relies on *Doe* v. *Doe*, supra, 244 Conn. 403, to argue that a person may become a parent under Connecticut law only by conception, adoption or by virtue of the artificial insemination statutes. As we already have observed, however, *Doe* was decided prior to the enactment of § 7-48a and represented a statement of the existing law at the time that case was decided. We did not state in *Doe*—nor could we have—that the legislature lacked the power to enact legislation that would provide another means by which persons could become legal parents. *Doe* stated that the *court* was "not at liberty to bestow parental status independent of [the adoption statutory] scheme." Id., 444. Furthermore,

[33] General Statutes § 19a-40 provides: "The Department of Public Health shall have general supervision of the state system of registration of births, marriages, deaths and fetal deaths, and shall develop the necessary uniform methods and forms for obtaining and preserving such records in order to insure the faithful registration of such records in the several towns and in the department. The department shall recommend such forms, procedures and legislation as are necessary to secure *complete and accurate registration of vital statistics throughout the state.* The Commissioner of Public Health shall be the superintendent of registration of vital statistics." (Emphasis added.)

[34] General Statutes § 19a-42 (a) establishes guidelines for the amendment of vital records and provides in relevant part that "[t]o protect the integrity and accuracy of vital records, a certificate registered under chapter 93 may be amended only in accordance with sections 19a-41 through 19a-45, inclusive, chapter 93, regulations adopted by the Commissioner of Public Health pursuant to chapter 54 and uniform procedures prescribed by the commissioner. . . ."

we were very aware in *Doe* that our law had not yet addressed the myriad issues presented by the use of ever-advancing assisted reproductive technology. We carefully limited the scope of our holding in *Doe* by stating that the case did "not involve questions of how, if at all, to reconcile our family relations statutes, as interpreted by this court, with scientifically new methods of conception that were not available when those statutes were enacted or when those interpretations were issued. . . . *[W]e need not, and do not, in this case confront questions of parentage, under those statutes, resulting from such recent scientific innovations as, for example, in vitro fertilization using donated eggs that are then implanted in a woman's womb . . . implantation into a woman's womb of a frozen embryo formed by the sperm and egg of strangers to both the woman and her husband . . . or other similar innovations in which a woman who gives birth to a child is not the same woman who produced the egg that was ultimately fertilized by a man's sperm.*" (Citations omitted; emphasis added.) Id., 417–18. Finally, *Doe* did not involve a claim that an intended parent had gained parental status by virtue of a gestational agreement. Instead, the primary argument advanced by the plaintiff in *Doe* was that she had acquired parental status by virtue of the equitable parent doctrine, a claim that we rejected in *Doe*. Id., 443–44. *Doe* and the precedents on which it relied cannot be read, therefore, to limit the scope of § 7-48a.

The department also contends that courts in other jurisdictions have concluded that the legislature is the appropriate body to devise new rules for the regulation of gestational agreements. See, e.g., *Culliton* v. *Beth Israel Deaconess Medical Center*, 435 Mass. 285, 293, 756 N.E.2d 1133 (2001) (noting that legislature had not yet enacted comprehensive statutory scheme addressing issues arising from use of assisted reproduc-

tive technology and stating that legislature "is the most suitable forum to deal with the questions involved in this case, and other questions as yet unlitigated, by providing a comprehensive set of laws that deal with the medical, legal, and ethical aspects of these practices"); *In re C.K.G.*, 173 S.W.3d 714, 730 (Tenn. 2005) (deciding maternity question presented by artificial insemination with donated egg narrowly in recognition that, due to "far-reaching, profoundly complex, and competing public policy considerations implicated by" use of assisted reproductive technology, legislature is appropriate body to craft "general rule to adjudicate all controversies" that arise from its use).

We agree that the legislature is the appropriate body to craft specific rules and procedures governing gestational agreements. That precept does not conflict with our decision today, which interprets § 7-48a in accordance with well established rules of statutory construction. Our decision is grounded on and guided by the intent of the legislature. Moreover, because we agree with the department that the legislature is the appropriate body to establish specific standards, rules and procedures governing gestational agreements, and because our starting point in this decision is an unchallenged ruling that the instant gestational agreement is valid, we have confined the scope of our holding to valid gestational agreements.

Indeed, this appeal highlights the fact that our existing statutes addressing parentage do not address the public policy concerns raised by modern assisted reproductive technology. The legislature itself has recognized that it has postponed confronting these issues. In 2007, the legislature amended §§ 45a-771a and 45a-775; see Public Acts 2007, No. 07-93, §§ 1 and 3; redefining artificial insemination to include the use of an egg donor and providing that egg donors, like sperm donors, have no parental rights. In discussing the amendment,

Representative Arthur J. O'Neill observed that this change was "one small part of what once was a very large [b]ill that the [l]aw [r]evision [c]ommission worked on, probably six or seven years ago, in an effort to try to come up with some comprehensive legislation to deal with a number of issues that are created by the new technology of reproduction that has been developing over the last few years." 50 H.R. Proc., Pt. 14, 2007 Sess., p. 4438. He further observed that the inclusion of egg donors within the artificial insemination statutes was "actually one of the easier parts of this subject to deal with and it's something that's straightforward and understandable. But there are many other issues that we are probably going to have to confront.

"And I'm gathering, based on this [b]ill before us, that it's going to be in a piecemeal sort of way that we deal with all of these issues of technological innovation in the area of reproduction and legal issues that crop up that really need to be resolved so that the families are not left in a state of confusion as to what they should do." Id., pp. 4438–39.

Representative O'Neill could not have phrased this issue more precisely—this area of law needs to be clarified so that families are not left in a state of confusion. Our existing statutory scheme only partially addresses these issues. Parentage, however, is not an issue that should be addressed in a "piecemeal" fashion. As we already have observed in this opinion, our existing statutes provide few answers and raise many questions. It is decidedly not the role of this court to make the public policy determinations necessary to establish the specific rules and procedures governing the validity of gestational agreements or set the standards for valid gestational agreements. The legislature will be required to grapple with numerous questions implicating significant public policy issues—that body, with the ability to hold public hearings and seek out expert assistance,

is the appropriate one to make such public policy determinations.

We highlight some of the issues that remain unresolved in our current statutory scheme by looking to the laws of other jurisdictions that have grappled with these public policy issues. In jurisdictions that have addressed the issues raised by the use of assisted reproductive technology,[35] it appears that there are three general approaches to the determination of legal parentage. Those three approaches define parentage based on: (1) the intent of the parties; see, e.g., *Johnson* v. *Calvert*, 5 Cal. 4th 84, 93, 851 P.2d 776, 19 Cal. Rptr. 2d 494, cert. denied, 510 U.S. 874, 114 S. Ct. 206, 126 L. Ed. 2d 163 (1993); Nev. Rev. Stat. § 126.045 (2) (2009); (2) the genetic relatedness of the parties; see, e.g., *Culliton* v. *Beth Israel Deaconess Medical Center*, supra, 435 Mass. 286–87; *Belsito* v. *Clark*, 67 Ohio Misc. 2d 54, 64–66, 644 N.E.2d 760 (1994); or (3) giving birth. See, e.g., *McDonald* v. *McDonald*, 196 App. Div. 2d 7, 9, 608 N.Y.S.2d 477 (1994).[36]

---

[35] Connecticut is not alone in failing to enact laws addressing the issues implicated by assisted reproductive technology. An astonishing twenty states have not weighed in at all on the validity of gestational agreements, including Alaska, Colorado, Delaware, Georgia, Hawaii, Idaho, Maine, Maryland, Minnesota, Mississippi, Missouri, Montana, North Carolina, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Vermont and Wyoming.

[36] Some states have barred gestational agreements altogether, including Arizona, Indiana, Michigan, New York, North Dakota and the District of Columbia. See Ariz. Rev. Stat. § 25-218 (A) (2007); but see *Soos* v. *Superior Court*, 182 Ariz. 470, 474–75, 897 P.2d 1356 (1994) (holding Ariz. Rev. Stat. § 25-218 unconstitutional in violation of federal equal protection clause because statute creates rebuttable presumption that husband of gestational carrier is father, but does not allow intended mother to rebut presumption that gestational carrier is mother); D.C. Code Ann. § 16-402 (LexisNexis 2008). Ind. Code §§ 31-20-1-1 and 31-20-1-2 (LexisNexis 2009); Mich. Comp. Laws § 722.855 (2005); N.Y. Dom. Rel. Law §§ 122 and 123 (McKinney 2010); N.D. Cent. Code § 14-18-05 (2009). Two states, Alabama and Iowa, have only gone so far as to *decriminalize* surrogacy. See Ala. Code §§ 26-10A-33 and 26-10A-34 (2009); Iowa Code Ann. § 710.11 (West 2003).

How a state defines parentage is merely the starting point. Additional issues that some states have addressed, for example, include whether to recognize compensated gestational agreements,[37] whether to limit the availability to married couples,[38] infertile intended parents,[39] age limitations,[40] what protections to put in place to safeguard the gestational carrier's right to make

[37] Ten states prohibit compensated gestational agreements, including Florida, Kansas, Kentucky, Louisiana, Nebraska, Nevada, New Hampshire, New Mexico, Virginia and Washington. See Fla. Stat. Ann. § 742.15 (4) (West 2010); Opinions, Kan. Atty. Gen. No. 96-73 (September 11, 1996) (compensation for gestational agreement does not fall within statutory exception permitting fee for professional service rendered in connection with adoption); Ky. Rev. Stat. Ann. § 199.590 (4) (LexisNexis 2007); La. Rev. Stat. Ann. § 9:2713 (2005); Neb. Rev. Stat. § 25-21,200 (1995); Nev. Rev. Stat. § 126.045 (3) (2009); N.H. Rev. Stat. Ann. §§ 168-B:16 (IV) and 168-B:25 (V) (2002); N.M. Stat. Ann. § 32A-5-34 (F) (West 2006); Va. Code Ann. § 20-160 (B) (4) (2008); Wn. Rev. Code Ann. § 26.26.240 (West 2005). Illinois, Texas and West Virginia, on the other hand, appear to authorize compensated gestational agreements. See 750 Ill. Comp. Stat. Ann. 47/25 (d) (3) (West 2009); Tex. Fam. Code Ann. §§ 160.751 through 160.753 (Vernon 2008); W. Va. Code § 48-22-803 (e) (3) (LexisNexis 2009).

[38] Some states require that intended parents be married. See, e.g., Fla. Stat. Ann. § 742.15 (1) (West 2010); Nev. Rev. Stat. § 126.045 (4) (b) (2009); Tex. Fam. Code Ann. § 160.754 (b) (Vernon 2008).

Although Arkansas, which appears to recognize only traditional surrogacies, does not require that intended parents be married, its statutes establish a presumption that a child born by means of artificial insemination to a surrogate mother who is married is the child of the biological father and the "woman intended to be the mother *if the biological father is married* . . . ." (Emphasis added.) Ark. Code Ann. § 9-10-201 (b) (1) (2009). By contrast, if the biological father is not married, the child is the child of the biological father only.

[39] Some states require that one or both of the intended parents must have a "medical need" for the use of a gestational carrier. See, e.g., Fla. Stat. Ann. § 742.15 (2) (West 2010); 750 Ill. Comp. Stat. Ann. 47/20 (b) (2) (West 2009); N.H. Rev. Stat. Ann. § 168-B:17 (II) (2002); Va. Code Ann. § 20-160 (B) (8) (2008).

[40] For example, Florida requires that both the gestational carrier and the intended parents be eighteen years or older. Fla. Stat. Ann. § 742.15 (1) (West 2010). Illinois requires that the gestational carrier must be at least twenty-one years of age. 750 Ill. Comp. Stat. Ann. 47/20 (a) (1) (West 2009). New Hampshire requires that all parties to the contract must be at least twenty-one years of age. N.H. Rev. Stat. Ann. § 168-B:17 (I) (2002).

decisions regarding healthcare and termination of the pregnancy until the child has been delivered,[41] whether to require that the spouse of the gestational carrier either consent or be made a party to the contract,[42] what measures to put in place to safeguard the legal rights of the parties,[43] who should be required to obtain

[41] See, e.g., Fla. Stat. Ann. § 742.15 (3) (a) (West 2010).

[42] See, e.g., 750 Ill. Comp. Stat. Ann. 47/25 (b) (2) (i) (West 2009); Va. Code Ann. § 20-160 (B) (10) (2008).

[43] Illinois, New Hampshire and Virginia, each of which has enacted a comprehensive statutory scheme addressing issues that arise from the use of assisted reproductive technology, each incorporate numerous provisions safeguarding the legal rights of the parties to gestational agreements. For example, among the many legal protections incorporated into Illinois' statutory scheme are the requirements that gestational agreements be in writing, and that the gestational carrier and intended parents must be represented by separate counsel. 750 Ill. Comp. Stat. Ann. 47/25 (b) (1) and (3) (West 2009). Additionally, the parties must sign acknowledgments that they have received information regarding the "legal, financial, and contractual rights, expectations, penalties and obligations of the surrogacy agreement . . . ." 750 Ill. Comp. Stat. Ann. 47/25 (b) (3.5) (West 2009). The gestational agreement also must be witnessed by two competent adults. 750 Ill. Comp. Stat. Ann. 47/25 (b) (5) (West 2009). A gestational carrier and the intended parents each must have consulted with counsel regarding the potential legal consequences of the gestational agreement. 750 Ill. Comp. Stat. Ann. 47/20 (a) (5) and (b) (4) (West 2009).

New Hampshire requires judicial preauthorization of a gestational agreement, prior to the medical procedure to impregnate the gestational carrier. N.H. Rev. Stat. Ann. § 168-B:16 (I) (b) (2002). At the hearing, the court must make findings that all parties to the gestational agreement have given their informed consent and that the agreement contains no unconscionable terms. N.H. Rev. Stat. Ann. § 168-B:23 (III) (a) and (b) (2002). The contract must be signed by the gestational carrier and her spouse if she is married. N.H. Rev. Stat. Ann. § 168-B:25 (2002). In addition, New Hampshire requires that a gestational agreement provide that the gestational carrier has the right to keep the child if, within seventy-two hours after the birth of the child, the carrier executes a signed statement of her intent to keep the child and delivers the writing to the intended parents and the attending physician or the hospital medical director or designee. N.H. Rev. Stat. Ann. § 168-B:25 (IV) (2002).

Similar to New Hampshire, Virginia requires that a petition for court approval of a surrogacy contract be filed prior to the performance of assisted conception. One of the required findings by the court is that the parties have voluntarily entered into the gestational agreement and understand its terms. Va. Code Ann. § 20-160 (B) (4) (2008).

health insurance coverage,[44] whether to require that at least one intended parent contribute genetic material,[45] and whether to require mental and physical health evaluations and home studies.[46]

Further guidance may be provided by article eight of the Uniform Parentage Act of 2000 (act). See Unif. Parentage Act §§ 801 through 809, 9B U.L.A. 299–376 (2001). Among the provisions included in the act are: specific procedural requirements for the hearing to validate the gestational agreement, including a residency requirement; joinder of the spouse of the gestational carrier, if she is married; a required finding by the court that the intended parents meet the standards of suitability applicable to adoptive parents and a finding of voluntariness as to all parties to the gestational agreement;

[44] Illinois requires that the gestational carrier be covered by health insurance and provides that either the gestational carrier or the intended parents may obtain coverage. 750 Ill. Comp. Stat. 47/20 (a) (6) (West 2009).

[45] See, e.g., 750 Ill. Comp. Stat. Ann. 47/20 (b) (1) (West 2009); N.H. Rev. Stat. Ann. § 168-B:17 (III) (2002); Va. Code Ann. § 20-160 (B) (9) (2008).

In addition to requiring that at least one intended parent must contribute a gamete, New Hampshire bars the use of a third party egg donor—the egg must either come from the intended mother or the gestational carrier. N.H. Rev. Stat. Ann. § 168-B:17 (III) and (IV) (2002).

Texas does not appear to require that one of the intended parents contribute genetic material, and allows a donor egg to be used, but prohibits the use of the gestational carrier's eggs in the assisted reproduction procedure. Tex. Fam. Code Ann. § 160.754 (c) (Vernon 2008).

Nevada requires that both intended parents must contribute the gametes used in the assisted reproduction procedure. Nev. Rev. Stat. § 126.045 (4) (a) (2009).

[46] See, e.g., 750 Ill. Comp. Stat. Ann. 47/20 (a) (3) and (4), and (b) (3) (West 2009) (gestational carrier must have mental and physical health evaluation; intended parents must have mental health evaluation); N.H. Rev. Stat. Ann. § 168-B:18 (II) and (III) (2002) (all parties must undergo "nonmedical evaluation" and home study to determine ability to parent and to adjust to and assume risks of contract and ability to provide child with food, clothing, shelter, medical care and necessities); N.H. Rev. Stat. Ann. § 168-B:19 (I) (2002) (participants in medical procedures must be medically evaluated); Va. Code Ann. § 20-160 (B) (2) and (6) (2008) (court shall order home study of all parties to contract; all parties have submitted to physical and psychological evaluations).

Unif. Parentage Act §§ 802 and 803, 9B U.L.A. 363–64 (2001); procedures upon termination of the gestational agreement; Unif. Parentage Act § 806, 9B U.L.A. 367 (2001); procedures upon the birth of the child, including the issuance of a court order declaring parentage and directing the responsible agency to issue a birth certificate naming the intended parents as parents to the child; Unif. Parentage Act § 807, 9B U.L.A. 368 (2001); the effect of a subsequent marriage of the gestational carrier; Unif. Parentage Act § 808, 9B U.L.A. 368 (2001); and the effect of a nonvalidated gestational agreement. Unif. Parentage Act § 809, 9B U.L.A. 369 (2001).

We emphasize that the legislature is the appropriate body to make the public policy determinations implicated by these issues. Because of the uncertainties created by the existing statutory scheme, we respectfully would suggest that the legislature consider doing so. Particularly important will be a determination of which types of gestational agreements are valid, as that determination will decide who may benefit from the streamlined process to parentage created by § 7-48a. As we have stated previously in this opinion, in the language of § 7-48a, the legislature already implicitly has recognized that at least some gestational agreements are valid. That general recognition of validity has little practical use, however, until the legislature clarifies specifically what requirements must be met in order for a gestational agreement to be valid. For today, we answer only the narrow question presented in this appeal: Upon a court order pursuant to § 7-48a, intended parents who are parties to a valid gestational agreement acquire parental status and are entitled to be named as parents on the replacement birth certificate, without respect to their biological relationship to the children.

The judgment is affirmed.

In this opinion ROGERS, C. J., and NORCOTT, KATZ and PALMER, Js., concurred.

ZARELLA, J., with whom VERTEFEUILLE, J., joins, concurring. I agree with part I of the majority opinion addressing the jurisdictional claim of the defendant department of public health (department). I also agree with the conclusion in part II affirming the trial court's order directing the department to issue a replacement birth certificate, pursuant to General Statutes § 7-48a, naming the plaintiff and intended parent, Shawn Hargon, as a parent of the children born under the gestational agreement to which he is a party.[1] I write separately, however, because I believe that when the tools of statutory construction are properly applied, there is no ambiguity in § 7-48a and related statutes as to whether Hargon's lack of a biological relationship to the children precludes a judge of the Superior Court from ordering that he be named as a parent on the replacement birth certificate. I also write separately because I believe that, to the extent that the majority finds it necessary to examine the legislative history of § 7-48a, it overlooks certain parts of that history and reaches conclusions that the legislative history does not support. Furthermore, the majority improperly examines the statute's legislative history *after* determining that precluding an intended parent with no biological relationship to the child from being named on the replacement birth certificate could lead to a bizarre result, thus introducing conflicting law into our deeply rooted precedent on statutory construction, which *never* has allowed for an examination of the legislative history after the court has determined that construing a statute in any other manner could lead to a bizarre result. The majority's reliance on the legislative history, even after finding that there is only one plausible interpretation of the statute, also ignores the clear mandate of General Statutes § 1-2z not to consider extratextual

---

[1] I presume, as does the majority, that the gestational agreement is valid.

evidence of the meaning of a statute *except* when more than one plausible interpretation exists. See *Ziotas* v. *Reardon Law Firm, P.C.*, 296 Conn. 579, 587, 997 A.2d 453 (2010). Finally, I do not think it wise to send the legislature a lengthy laundry list of unresolved questions pertaining to gestational agreements, together with pointed references to statutes enacted by other jurisdictions indicating how those questions might be resolved. Such an uninvited request, the scope of which, to my knowledge, far exceeds any prior call for legislative action by this court, is not essential to a resolution of the issues in this case and represents an inappropriate intrusion into the legislative domain. I discuss each point in turn.

I

The majority concludes that the meaning of § 7-48a is ambiguous with respect to whether Hargon, who has no biological relationship to the children, may be named as a parent on the replacement birth certificate. The majority reaches this conclusion because there is no definition of the terms "birth mother" or "gestational agreement" in § 7-48a, and no language in any related statute indicating that a person identified as an intended parent in a gestational agreement with no biological ties to the unborn child may be named as a parent in a replacement birth certificate without first adopting the child. I disagree.

"The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning . . . § 1-2z directs us first to

consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Mickey* v. *Mickey*, 292 Conn. 597, 613–14, 974 A.2d 641 (2009).

Section 7-48a, concerning the filing of birth certificates and replacement birth certificates, provides: "On and after January 1, 2002, each birth certificate shall be filed with the name of the birth mother recorded. *If the birth is subject to a gestational agreement, the Department of Public Health shall create a replacement certificate in accordance with an order from a court of competent jurisdiction not later than forty-five days after receipt of such order or forty-five days after the birth of the child, whichever is later.* Such replacement certificate shall include all information required to be included in a certificate of birth of this state as of the date of the birth. When a certified copy of such certificate of birth is requested by an eligible party, as provided in section 7-51, a copy of the replacement certificate shall be provided. The department shall seal the original certificate of birth in accordance with the provisions of subsection (c) of section 19a-42. Immediately after a replacement certificate has been prepared, the department shall transmit an exact copy of such certificate to the registrar of vital statistics of the town of birth and to any other registrar as the department deems appropriate. The town shall proceed in accor-

dance with the provisions of section 19a-42." (Emphasis added.)

The language of the statute is plain and unambiguous. The term "subject to" in § 7-48a is defined, inter alia, as "governed or affected by . . . ." Black's Law Dictionary (6th Ed. 1990). The statute thus must be construed to mean that a birth "subject to" a gestational agreement is governed by its provisions. It follows that when a gestational agreement provides in clear and unequivocal language that a carrier shall bear a child for persons identified as the child's intended parents, the department shall create a replacement birth certificate upon an order from a court of competent jurisdiction in accordance with the terms of the agreement, even if one of the intended parents is not biologically related to the child.

This conclusion is confirmed by a reading of General Statutes § 19a-42, to which § 7-48a refers and which the majority completely ignores. Section 19a-42, regarding the amendment of vital records, provides in relevant part: "(a) . . . Amendments [to birth certificates] related to parentage or gender change shall result in the creation of a replacement certificate that supersedes the original, and shall in no way reveal the original language changed by the amendment. . . .

"(c) . . . The original certificate in the case of parentage or gender change shall be physically or electronically sealed and kept in a confidential file by the department and the registrar of any town in which the birth was recorded, and may be unsealed for viewing or issuance only upon a written order of a court of competent jurisdiction. The amended certificate shall become the public record. . . ."

General Statutes § 7-36 defines the terms used in §§ 7-48a and 19a-42. Section 7-36 (10) specifically defines "[a]mendment," in part, as meaning to "create a replace-

ment certificate of birth for matters pertaining to parentage and gender change . . . ." Section 7-36 (13) defines "[p]arentage" as "includ[ing] matters relating to adoption, gestational agreements, paternity and maternity . . . ."

Reading these statutes together, they clearly provide that an amendment to a birth certificate for a birth governed by a gestational agreement shall result in a replacement birth certificate that supersedes the original. There is no qualifying language in §§ 7-48a, 19a-42, 7-36 (10) or (13), limiting the persons who may be named as parents in a replacement birth certificate to intended parents who are biologically related to the child. If the legislature had intended to impose such a restriction it easily could have done so. See, e.g., *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 729, 6 A.3d 763 (2010); see also *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 299, 933 A.2d 256 (2007) (legislature knows how to convey its intent expressly). There is also no language in any other related statute suggesting that a person named as an intended parent in a gestational agreement must be biologically related to the child in order to be named as a parent in a replacement birth certificate. "[W]e are not permitted to supply statutory language that the legislature may have chosen to omit." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, supra, 729; see also *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 119, 830 A.2d 1121 (2003).

The majority's conclusion that § 7-48a is ambiguous because it fails to define birth mother or gestational agreement ignores or overlooks the principle of statutory interpretation that, "[w]hen a statute does not provide a definition, words and phrases in a particular statute are to be construed according to their common

usage. . . . To ascertain that usage, we look to the dictionary definition of the term." (Internal quotation marks omitted.) *Potvin* v. *Lincoln Service & Equipment Co.*, 298 Conn. 620, 633, 6 A.3d 60 (2010); see also *Picco* v. *Voluntown*, 295 Conn. 141, 148, 989 A.2d 593 (2010); *Board of Selectmen* v. *Freedom of Information Commission*, 294 Conn. 438, 449–50, 984 A.2d 748 (2010); *Fairchild Heights, Inc.* v. *Amaro*, 293 Conn. 1, 9, 976 A.2d 668 (2009). The majority also overlooks General Statutes § 1-1 (a), which similarly provides that, "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly."

Because the term gestational agreement is a technical term that describes a certain type of contract, we turn to Black's Law Dictionary for guidance. Black's Law Dictionary contains no definition of gestational agreement but defines a "surrogate-parenting agreement" as, inter alia, "[a] contract between a woman and typically an infertile couple under which the woman provides her uterus to carry an embryo throughout pregnancy; [especially], an agreement between a person (the intentional parent) and a woman (the surrogate mother) providing that the surrogate mother will (1) bear a child for the intentional parent, and (2) relinquish any and all rights to the child . . . ." Black's Law Dictionary (9th Ed. 2009). "Gestational surrogacy" is further defined as "[a] pregnancy in which one woman (the genetic mother) provides the egg, which is fertilized, and another woman (the surrogate mother) carries the fetus and gives birth to the child." Id. Black's Law Dictionary distinguishes "gestational surrogacy" from "traditional surrogacy," by defining the latter as "[a] pregnancy in which a woman provides her

own egg, which is fertilized by artificial insemination, and carries the fetus and gives birth to a child for another person." Id. These definitions, when read in concert, establish that a gestational agreement, as opposed to a traditional surrogacy agreement, means an agreement between a surrogate mother, who is not the egg donor, and the intended parents, who may or may not be biologically related to the unborn child because of infertility or other reasons, by which the surrogate mother agrees to bear the child for the intended parents and relinquishes any and all rights to the child following its birth. In other words, there simply is no question that a person identified in a gestational agreement as an intended parent who is not biologically related to a child may be named as a parent in a replacement birth certificate, because infertility, which prevents one of the intended parents from having a biological relationship to the child, is the precise reason why gestational agreements were devised in the first place.[2]

The agreement in the present case, which is variously described therein as the "agreement," "carrier agreement," "gestational surrogacy arrangement" and "gestational carrier agreement," fits precisely within this framework. The agreement identifies the plaintiff, Anthony Raftopol, as the natural father and Hargon, who is not biologically related to the children, as the

---

[2] I note that traditional surrogacy agreements also incorporate the principle that one of the intended parents is not biologically related to the child because the surrogate mother under such arrangements donates her own egg due to the infertility of the intended parent. The only exception to the rule that at least one of the intended parents named in a gestational or a traditional surrogacy agreement is not biologically related to the unborn child would seem to be when a woman is unable to carry and give birth to a child for medical reasons and the egg of the intended mother and the sperm of the intended father are used to create an embryo that is then implanted in the gestational carrier's uterus.

"adopting parent,"[3] and states that the two are living together as lifetime partners and wish to take the children carried by the gestational carrier, the defendant Karma A. Ramey,[4] into their home.[5] The agreement further provides that Ramey, who is not the egg donor, desires to facilitate placement of the children with Raftopol and Hargon and will fully cooperate to achieve this goal by consenting to "the entry of an order after the child is born, placing the names of the natural father and the adopting parent on the birth certificate, and the award of custody to the natural father and adopting parent, and if necessary . . . to a second parent adoption of the child by the adopting parent." Accordingly, it could not be more clear under the terms of the parties' agreement that the court may order the department to issue a replacement birth certificate pursuant to § 7-48a naming Hargon as one of the parents, regardless of the fact that he has no biological relationship to the children.

## II

To the extent that the majority finds § 7-48a ambiguous and examines the legislative history, I disagree with its analysis. The majority's exclusive focus is on two

---

[3] Although the agreement describes Hargon as the "adopting parent," its language indicates an understanding by the parties that Hargon's adoption of the children would occur by operation of the gestational agreement itself, and that he would adopt the children by more traditional means only "if necessary . . . ." See following text citing agreement's language.

[4] Although Ramey was named in the action as a defendant, she no longer is a party to this appeal.

[5] The gestational surrogacy agreement, entitled "Carrier Agreement," provides in relevant part: "The adopting parent [Hargon] and natural father [Raftopol] are living together, as lifetime partners, both are over the age of eighteen . . . years, and both are desirous of entering into the following agreement. The adopting parent and natural father desire to take into their home the child or children . . . as their own whom is/are carried by the carrier and is/are biologically related to the natural father. The carrier wishes to facilitate the child's placement with the adopting parent and natural father and will fully cooperate to achieve this goal."

earlier versions of the statute *before* the present language on gestational agreements was added in 2008. The majority thus fails to discuss the most relevant portion of the statute's legislative history. In addition, I disagree with the majority's conclusion that the only legislative intent that can be gleaned from the legislative history is that § 7-48a allows a biological parent who is not the birth parent to be declared the parent of the child and to be listed on the replacement birth certificate without the requirement of an adoption. In fact, I cannot divine how the majority reaches this conclusion, especially after conceding that there is evidence in the legislative history that supports the opposite conclusion.

A

The legislative history of § 7-48a can be understood only in conjunction with the legislative history of § 19a-42. Public Acts 2001, No. 01-163 (P.A. 01-163), proposed the enactment of a new section to chapter 7, concerning vital records, as well as major changes to the then existing § 19a-42 regarding the amendment of vital records. As originally proposed in Raised Bill No. 6569, the portion of the Public Act that ultimately became § 7-48a of the General Statutes, included the following language on gestational agreements: "On receipt of a certified copy of an order of a court of competent jurisdiction approving a gestational agreement, the department shall prepare a new birth certificate for the child born of the agreement. The new birth certificate shall include all the information required to be set forth in a certificate of birth of this state as of the date of birth, except that the intended parent or parents under this agreement shall be named as the parent or parents."[6]

---

[6] The complete version of the proposed bill provided as follows: "Sec. 27. (NEW) (a) On receipt of a certified copy of an order of a court of competent jurisdiction approving a gestational agreement, the department shall prepare a new birth certificate for the child born of the agreement. The new birth certificate shall include all the information required to be

Raised Bill No. 6569, January 2001 Sess., § 27 (a). The language on gestational agreements, however, was eliminated in Substitute House Bill No. 6569, January 2001 Sess.,[7] which simply provided: "On and after January 1, 2002, each birth certificate shall contain the name of the birth mother, except by the order of a court of competent jurisdiction." P.A. 01-163, § 28; see also Gen-

set forth in a certificate of birth of this state as of the date of birth, except that the intended parent or parents under this agreement shall be named as the parent or parents.

"(b) Immediately after a new certificate of birth has been prepared, an exact copy of the certificate, together with a copy of the order of the court approving a gestational agreement, shall be electronically or manually transmitted by the department to the registrar of vital statistics of each town in this state in which the birth of the person is recorded. The new birth certificate, the original certificate of birth on file and the copy of the order of the court shall be filed and indexed pursuant to such regulations as the commissioner shall adopt, in accordance with chapter 54 of the general statutes, to carry out the provisions of this section and to prevent access to such records of birth and court order, except as provided in this section. Any person, except the intended parent or child born of the agreement, who discloses any information contained in such records, except as provided in this section, shall be fined not more than five hundred dollars or imprisoned not more than six months, or both.

"(c) When a certified copy of the birth certificate of a child born of a gestational agreement is requested by a person authorized to receive such copy pursuant to section 7-51 of the general statutes, as amended by this act, a copy of the new certificate of birth, as prepared by the department in accordance with the applicable provisions of section 19a-42 of the general statutes, as amended by this act, shall be provided. Access to or issuance of a certified copy of the original birth certificate to any person, including the intended parent or parents of the child or the child born of the gestational agreement, if over eighteen years of age, shall be permitted only upon a written order signed by a judge of the probate court for the district in which the gestational agreement was approved, or another court of competent jurisdiction. The original certificate so issued shall be marked with a notation by the issuer that the original certificate of birth has been superseded by a replacement certificate of birth as on file." Raised Bill No. 6569, January 2001 Sess., § 27 (a).

[7] The language in Substitute House Bill No. 6569 was changed as follows: "Sec. 28. (NEW) On and after January 1, 2002, each birth certificate shall contain the name of the birth mother, except by the order of a court of competent jurisdiction." Substitute House Bill No. 6569, January 2001 Sess., § 28, as amended by House Amendment Schedules A and B.

eral Statutes (Rev. to 2003) § 7-48a. Accordingly, the provision subsequently enacted by the legislature contained no language concerning gestational agreements and, following its incorporation in the General Statutes as § 7-48a, was entitled, "Birth certificate to contain name of birth mother." General Statutes (Rev. to 2003) § 7-48a. Significantly, there was no explanation in the newly enacted statute as to when the statutory exception to naming the birth mother on the birth certificate would apply.

This explanation was instead contained in an amendment to § 19a-42 that was also included in P.A. 01-163. Proposed changes to § 19a-42, on vital records, in both the raised and substitute bills, provided in relevant part that "[o]nly the commissioner [of the department][8] may amend birth certificates to reflect changes concerning parentage or gender change. Amendments related to parentage or gender change shall result in the creation of a replacement [birth] certificate that supersedes the original, and shall in no way reveal the original language changed by the amendment. . . ." Raised Bill No. 6569, January 2001 Sess., § 31 (a); Substitute House Bill No. 6569, January 2001 Sess., § 32 (a). Section 2 of the raised and substitute bills also added language to General Statutes § 7-36 pertaining to title 7 and § 19a-42, that defined "[a]mendment" in relevant part as meaning to "create a replacement certificate of birth for matters pertaining to parentage and gender change," and "[p]arentage" as "includ[ing] matters relating to adoption, gestational agreements, paternity and maternity . . . ." Raised Bill No. 6569, January 2001 Sess., § 2; Substitute House Bill No. 6569, January 2001 Sess., § 2.

---

[8] In 2005, the department adopted § 19a-41-8 (b) of the Regulations of Connecticut State Agencies clarifying, inter alia, that "[o]nly the commissioner shall make amendments pertaining to adoption, gestational agreements, or maternity *upon receipt of a court order* . . . ." (Emphasis added.)

Thus, the exception in § 7-48a to the naming of the birth mother in a birth certificate was described in the amendments that same year to §§ 19a-42 and 7-36, which provided that a replacement birth certificate superseding the original shall be created when the birth certificate is amended pursuant to changes in parentage and gender, such as those arising from a gestational agreement. Accordingly, the majority's first mistake in interpreting the legislative history is its conclusion that the legislature omitted more specific language on gestational agreements in the original version of § 7-48a because it rejected the notion of parenthood created solely by intent or because it wanted the courts to decide what additional information should be placed on birth certificates. As has been demonstrated, this conclusion is mistaken because it overlooks the crucial fact that the legislature did, in fact, provide for the creation of replacement birth certificates pursuant to gestational agreements in 2001, first, by permitting an exception in § 7-48a to the rule that a birth certificate must be filed with the name of the birth mother, and, second, by amending § 19a-42 to permit the issuance of replacement birth certificates pursuant to gestational agreements, among other reasons. For purposes of this case, the other significant fact about the legislative history of §§ 7-48a and 19a-42 in the year 2001 is that the legislature imposed no restriction, biological or otherwise, on the naming of a parent in a replacement birth certificate who is identified as the intended parent in a valid gestational agreement.

B

I also disagree with the majority's conclusion that the legislative history of Public Acts 2004, No. 04-255, in which the legislature amended § 7-48a to include language on replacement birth certificates, is ambiguous. Section 7-48a was greatly expanded in 2004 to include the following provision on replacement birth

certificates: "On and after January 1, 2002, each birth certificate shall contain the name of the birth mother, except by the order of a court of competent jurisdiction, and be filed with the name of the birth mother recorded. Not later than forty-five days after receipt of an order from a court of competent jurisdiction, the Department of Public Health shall create a replacement certificate in accordance with the court's order. Such replacement certificate shall include all information required to be included in a certificate of birth of this state as of the date of the birth. When a certified copy of such certificate of birth is requested by an eligible party, as provided in section 7-51, a copy of the replacement certificate shall be provided. The department shall seal the original certificate of birth in accordance with the provisions of subsection (c) of section 19a-42. Immediately after a replacement certificate has been prepared, the department shall transmit an exact copy of such certificate to the registrar of vital statistics of the town of birth and to any other registrar as the department deems appropriate. The town shall proceed in accordance with the provisions of section 19a-42." Public Act 04-255, § 28; see General Statutes (Rev. to 2005) § 7-48a.

This new language evidently was intended to correct whatever ambiguity had been created by the absence of language in the original statute regarding when to apply the exception to the rule that each birth certificate shall contain the name of the birth mother. By referring to the fact that such an exception would result in the creation of a replacement birth certificate and by expressly referring to § 19a-42 regarding the procedures to be followed in issuing such a certificate, the revised language made explicit the connection between §§ 7-48a and 19a-42 that had merely been implied when the legislature adopted § 7-48a and the amendment to § 19a-42 in 2001, although the amended language still did not

make direct reference to gestational or other surrogacy agreements.

Representative Donald B. Sherer, who introduced the amendment to his fellow House members, indicated his understanding of the substantive connection that the legislature had established in 2001 between §§ 7-48a and 19a-42 when he explained that, "[a] number of years ago . . . this legislature changed the birth certificate registration law to permit a court of [competent jurisdiction] being the Superior Court to find parentage in accordance with the biological relationship to a child rather than the birth mother if she wasn't the biological mother.

"And over the course of the years there's been some confusion as to how to effectuate the birth certificate. So the language in this amendment pretty much clarifies what to do. It says that after the court [orders] parentage, that within [forty-five] days after the presentation of the court order the [department] will issue a replacement birth certificate and the original birth certificate with all the required statistical information would remain confidential." 47 H.R. Proc., Pt. 14, 2004 Sess., pp. 4456–57. In response to a subsequent question as to whether the new provision would make it easier for some individuals to adopt without going to Probate Court, Representative Sherer added: "There's been a difficult situation where due to the . . . parents not being the birth parents the only way to obtain a new birth certificate would be to go to [P]robate [C]ourt and basically adopt their own child, which no one really thinks is the right thing to do." Id., p. 4459.

Representative Sherer's comments, when read in the proper context, are not ambiguous. In his first comment, in which he referred to previous changes in the law on vital records to permit a finding of parentage on the basis of the biological relationship of a mother

who was not the birth mother, he clearly was referring to the enactment of § 7-48a, and to changes in §§ 19a-42 and 7-36 enacted in 2001, allowing the amendment of birth certificates to reflect changes in parentage or gender such that an egg donor who was not the birth mother in a surrogacy arrangement could be named in a replacement birth certificate as the parent of the child. Similarly, Representative Sherer was clearly referring in his second comment to changes in the relevant statutes allowing any parent in a surrogacy arrangement who was not the birth parent to obtain a replacement birth certificate without going to Probate Court to adopt the child. By implication, this would include intended parents identified in gestational agreements who have no biological relationship to the child. Although there is nothing in Representative Sherer's comments relating directly to gestational agreements, his comments do not suggest that a person identified as an intended parent in a gestational agreement may not be named on the replacement birth certificate unless biologically related to the child. Accordingly, I would disagree with the majority that Representative Sherer's comments are ambiguous, except to the extent that they imply that a person named as a parent in a gestational agreement who has a biological relationship to the child also may be named as a parent on the replacement birth certificate.

C

In addition, the majority inexplicably fails to examine the most important part of the legislative history, namely, the 2008 amendment in which the legislature added the language on gestational agreements to the statute. As previously discussed, prior to 2008, § 7-48a contained no language referring to gestational agreements. In 2008, however, language was proposed in Public Acts 2008, No. 08-184, "clarifying" that § 7-48a was intended to apply to gestational agreements.

Notably, there was no discussion of this amendment during debate in the House or Senate, most likely because it was part of a much larger bill on a variety of other matters relating to public health. J. Robert Galvin, however, the commissioner of the department (commissioner), testified before the joint standing committee on public health on March 3, 2008, that "[t]he revised language [of the statute] makes clear that . . . § 7-48a pertains to the births that are subject to a gestational agreement. Without this revision, it is difficult to interpret this statute." Conn. Joint Standing Committee Hearings, Public Health, Pt. 2, 2008 Sess., p. 545. What the commissioner apparently meant was that the statute at that time merely provided for the issuance of a replacement birth certificate pursuant to an order from a court of competent jurisdiction without directly describing the circumstances under which the court could make such an order.[9]

The office of fiscal analysis and the office of legislative research provided the legislature with reports on the proposed revision consistent with the commissioner's testimony. In its report, the office of fiscal analysis stated that the amendment "clarifies law regarding the issuance of replacement birth certificates for births subject to a gestational agreement. This results in no fiscal impact." Office of Fiscal Analysis, Connecticut General Assembly, HB-5701 An Act Concerning Revisions to Statutes Pertaining to the Department of Public Health (2008) § 1. The office of legislative research bill analysis similarly explained in relevant part that "[t]he bill appears to limit the replacement certificate requirement to births that are subject to a gestational agreement."

[9] As previously discussed, these circumstances were described in § 19a-42, which provides for the issuance of replacement birth certificates to reflect changes in parentage or gender change, with parentage being defined as matters pertaining to adoption, gestational agreements, maternity or paternity. General Statutes § 7-36 (10) and (13).

Office of Legislative Research, Connecticut General Assembly, Bill Analysis HB 5701 An Act Concerning Revisions to Statutes Pertaining to the Department of Public Health (2008) § 1. Even more specific was the summary of 2008 Public Acts published by the office of legislative research and made available to the public[10] following passage of legislation during the General Assembly's regular and special sessions that year. The summary explained that "[t]he act limits the replacement certificate requirement to births that are subject to a gestational agreement, which is one between a woman and a couple that obligates the woman, often referred to as a surrogate mother, to carry the child for the intended parents." Office of Legislative Research, Connecticut General Assembly, Summary of 2008 Public Acts (2008) p. 239. Although all three publications acknowledged that they did not represent the intent of the General Assembly, the office of fiscal analysis and office of legislative research reports were available to the legislature when it was considering the revised language,[11] and all three consistently construed the new language in § 7-48a as a "clarification" of the then existing statute, which did not define the circumstances under which a replacement birth certificate could be issued except indirectly by reference to § 19a-42. Furthermore, none of the three publications described any

[10] A "Notice to Users" at the beginning of the summary states that the office of legislative research encourages dissemination of the summaries by photocopying, reprinting in newspapers or other means and that they are intended to be "handy reference tools . . . ." Office of Legislative Research, Connecticut General Assembly, Summary of 2008 Public Acts (2008) p. i.

[11] As we previously have recognized, the "fiscal impact statement and bill analysis are prepared for the benefit of members of the General Assembly, solely for purposes of information, summarization and explanation and do not represent the intent of the General Assembly or either house thereof for any purpose. . . . Although the comments of the office of legislative research are not, in and of themselves, evidence of legislative intent, they properly may bear on the legislature's knowledge of interpretive problems that could arise from a bill." (Internal quotation marks omitted.) *Butts* v. *Bysiewicz*, 298 Conn. 665, 688 n.22, 5 A.3d 932 (2010).

qualifications or limitations regarding who could be named on a replacement birth certificate, and none even remotely suggested that the legislature intended to *preclude* an intended parent in a gestational agreement who has no biological relationship to the child from being named as a parent on a replacement birth certificate.

Accordingly, the only conclusion that can be drawn from an examination of this legislative history is that a person named as an intended parent in a valid gestational agreement may also be named as a parent in a replacement birth certificate, regardless of whether that person has biological ties to the child. Trial courts that have considered the legislative history of the 2008 amendment have reached the same conclusion. See, e.g., *Griffiths* v. *Taylor*, Superior Court, judicial district of Waterbury, Docket No. FA 08-4015629 (June 13, 2008) (concluding that "the legislature contemplated that a [judge of the] Superior Court would have the authority, under § 7-48a, to enter a judgment on the validity of a gestational agreement and that where there is a valid agreement, the court may then order the [department] to issue a replacement birth certificate with the names of the intended parents on it"); see also *Cassidy* v. *Williams*, Superior Court, judicial district of Litchfield, Docket No. FA 08-4006951-S (July 9, 2008).

When the 2008 amendment is examined in the context of the *entire* legislative history of § 7-48a, it becomes easier to understand why the current revision of the statute is completely consistent with the language on gestational agreements that was omitted in 2001, with each subsequent version of the statute after that time, and with the language in § 19a-42, to which § 7-48a has referred since 2004. It is also clear that the legislature has never contemplated a statutory limitation, such as the requirement of a biological relationship to the child, that would in any way restrict the category of persons

named in a valid gestational agreement who also may be named in a replacement birth certificate under § 7-48a. Consequently, even if I agreed with the majority that it is necessary to examine the legislative history because there are ambiguities in the statute—which I do not—such an examination supports the conclusion that the legislature intended replacement birth certificates issued pursuant to valid gestational agreements to contain the names of the intended parents, regardless of whether they have a biological relationship to the child.

### III

The majority attempts to resolve the perceived ambiguity in § 7-48a and the legislative history by turning to the principle of statutory interpretation that "we construe a statute in a manner that will not . . . lead to absurd results." (Internal quotation marks omitted.) *Kelly* v. *New Haven*, 275 Conn. 580, 616, 881 A.2d 978 (2005). The majority agrees with the department's conclusion that a reading that construes § 7-48a to mean "that only a biological intended parent may gain parental status absent adoption proceedings, when examined in relation to the artificial insemination statutes, leads to the not very remote possibility [and absurd result] of a child who comes into the world with no parents—a parentless child." Although I agree that we could apply the principle that we construe a statute to avoid absurd results in affirming the trial court's judgment, the majority applies the principle in complete disregard of our well established law on statutory interpretation, and, in so doing, significantly weakens the plain meaning rule.

As previously stated, and recognized by the majority, this court is required to follow § 1-2z in seeking the meaning of a statute. Specifically, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other

statutes. *If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.*" (Emphasis added.) General Statutes § 1-2z. As also recognized by the majority, "[t]he test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Ziotas* v. *Reardon Law Firm, P.C.*, supra, 296 Conn. 587; see also *Tayco Corp.* v. *Planning & Zoning Commission*, 294 Conn. 673, 686, 986 A.2d 290 (2010) ("[W]e construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." [Internal quotation marks omitted.]).

From this it is evident that the principle that a statute should not be construed in a manner that would lead to an absurd or bizarre result leaves no room for an examination of the legislative history when the court concludes that there is only one reasonable or plausible interpretation of the statute, namely, the one that the court is adopting. In other words, it is necessary and permissible to examine the legislative history for the purpose of discerning the legislative intent only when there is *more* than one plausible interpretation of the statute or when the only seemingly plausible interpretation would lead to an absurd result. See *Ziotas* v. *Reardon Law Firm, P.C.*, supra, 296 Conn. 587. Accordingly, when the majority consults the legislative history *after* determining that construing § 7-48a to preclude intended parents with no biological relationship to the child from being named on the replacement birth certificate would lead to an absurd result, it disregards the plain meaning rule and the analytical procedure that is

traditionally invoked when the court concludes that interpreting a statute in any other manner would lead to an absurd result. The majority thus unwisely injects inconsistent reasoning and uncertainty into our precedent concerning statutory interpretation.

The majority justifies its approach, which it fails to bolster with any precedential support, by stating that "[t]he mere fact . . . that the department's proposed interpretation of § 7-48a leads to an absurd result does not necessarily lead to the conclusion, based on the plain language of the statute, that § 7-48a confers parental status on Hargon by virtue of the gestational agreement" because "many ambiguities" remain. The majority describes these ambiguities as "the nature and scope of 'an order from a court of competent jurisdiction,' the types of gestational agreements that would give rise to such an order, whatever it may be, [and] who may be an intended parent, just to name a few." I find this rationale inadequate for two reasons. First, it embodies the internal contradiction that a statute may remain ambiguous with respect to the question before the court, even though there can be only one reasonable interpretation of the statutory language in the factual context presented. Second, the so-called "ambiguities" identified by the majority have absolutely no relevance to the issue before this court. It is abundantly clear that the issue to be decided in this case does not involve the "nature and scope" of the trial court's order, whether the gestational agreement into which the parties entered is the type of agreement that could give rise to such an order or whether Hargon was the intended parent named in the gestational agreement, but, rather, the very narrow issue of whether Hargon may be named on the replacement birth certificate even though he has no biological ties to the children born thereunder. Thus, it is whether a biological relationship is required between Hargon, the intended par-

ent, and the children, and not any other issue, that is presented to this court on appeal, and the majority's ruminations as to other "ambiguities" in the statute have nothing at all to do with the issue in this case. In fact, the majority expressly recognizes the futility and lack of relevance of examining the statute's legislative history when it concludes, after doing so, that the legislative history is "inconclusive" as to whether the statute was intended to allow a nonbiological intended parent to be named on a replacement birth certificate, but, nevertheless, it does not matter that the legislative history is inconclusive because the majority has "already . . . rejected, on the basis of [its] plain language analysis, the department's contention that only biological intended parents may acquire legal parentage solely by virtue of a valid gestational agreement." If this is in fact an accurate summation of the majority's plain meaning analysis, which I believe it is, then the majority must concede that the legislative history has no relevance and should not have been consulted after it determined that there was only one plausible interpretation of the statute. Accordingly, the majority's reason for examining the legislative history after concluding that there is only one reasonable interpretation of the statute, *insofar as it relates to the question on appeal*, is repudiated by the majority itself and makes no sense whatsoever.

## IV

My final comment pertains to the last part of the majority opinion, which provides the legislature with a detailed road map indicating how the law on gestational agreements should be clarified. The majority makes much of the fact that "the legislature is the appropriate body to craft specific rules and procedures governing gestational agreements," and that it is not the role of the courts to advise the legislature. The majority nonetheless states that "this appeal highlights the fact that our existing statutes addressing parentage do not

address the public policy concerns raised by modern assisted reproductive technology." After observing that "[i]t is decidedly not the role of this court to make the public policy determinations necessary to establish the specific rules and procedures governing the validity of gestational agreements or set the standards for valid gestational agreements," the majority proceeds to take this opportunity to "highlight some of the issues [involving key public policy determinations] that remain unresolved in our current statutory scheme . . . ." The majority then provides approximately four pages of citations to statutes enacted by our sister states and to various provisions in the Uniform Parentage Act of 2000; see Unif. Parentage Act §§ 801 through 809, 9B U.L.A. 299–376 (2001); concerning issues relating to gestational agreements for the purpose of instructing the legislature as to matters that require clarification. Although I believe it is appropriate for this court to convey to the legislature that additional guidance in this area of the law would be helpful, I am unaware of another opinion of this court that goes so far in attempting to construct a legislative agenda. Accordingly, I view this extraordinary step as excessive.

For the foregoing reasons, I concur only in the result reached by the majority in part II of its opinion.