SHIRLEY S. ABRAHAMSON, C.J.
¶ 76. {concurring) I too would remand the matter to the circuit court. I would, however, instruct the circuit court to follow the legislative directive in Wis. Stat. § 767.41(5) (am) for deciding the legal custody and physical placement dispute in the present case.
*125 ¶ 77. I do not join the majority opinion because I disagree with the majority opinion's authorization of people to contract out of the State's traditional, statutory oversight role in the protection of children.
¶ 78. Courts should not sacrifice statutes or public policy considerations on the altar of freedom of contract:
There are, in a civilized society, some things that money cannot buy. In America, we decided long ago that merely because conduct purchased by money was "voluntary" did not mean that it was good or beyond regulation and prohibition.[1]
¶ 79. I write separately for two reasons:
¶ 80. First, although I conclude that surrogacy contracts are not per se void as a matter of law in Wisconsin, I caution that the provisions of these contracts demand a court's careful attention. Courts must be alert to the terms of a surrogacy contract no matter how the parties title the contract. In the present case, the parties decided to call the surrogacy contract a "Parentage Agreement."
¶ 81. A surrogacy contract is no less than a contract that governs bodily intrusions, the use of human bodies for altruistic or commercial gain, the creation of a child, and the legal custody and physical placement of a child once it is born.
¶ 82. Such agreements are not standard run-of-the-mill contracts subject merely to the usual offer, acceptance, and consideration analysis. See majority op., ¶¶ 57, 59. Standard contract defenses and remedies are a starting point, but may not be sufficient. *126 Surrogacy contracts, in whole or in part, are by their subject matter likely to collide with statutes and raise numerous public policy issues (some addressed directly by statute, others not) and questions of unconscionability. The majority opinion takes a carefree attitude toward public policy considerations, seemingly declaring all surrogacy agreements valid.[2]
¶ 83. Public policy considerations regarding a surrogacy contract may differ depending on the nature of the dispute. In the present case the dispute centers on the paternity, the custody, and the physical placement of a child born of alternative reproductive methods with a surrogacy agreement among friends. See ¶¶ 104-112, *127 infra. Although the biological parents "contractually" agreed in the present case that the child's best interests would be served if the surrogate mother did not have custody and physical placement, the surrogate mother has refused to abide by the terms of the contract. Majority op., ¶¶ 12, 72 n.12
¶ 84. Different legal and public policy issues may arise in different disputes and under different contract provisions. Different issues may arise when gestational surrogacy agreements, rather than traditional surrogacy agreements, are implicated. In all surrogacy contracts, public policy issues are in the forefront.[3]
¶ 85. Second, I write because the present case arose as a petition by David Rosecky for paternity requesting a determination of the legal custody and physical placement of the named child. The majority opinion ignores the posture of the case and mischaracterizes the instant case as simply a contract dispute. Majority op., ¶¶ 28, 48, 55-60, 66-69.
¶ 86. All three actions brought by David Rosecky, the biological father — for paternity, custody, and physical placement — are, under the plain text of the statutes, categorized as "actions affecting the family," and as such are governed by Chapter 767. See ¶¶ 104-112, infra. The legislative standard established in Chapter 767 for legal custody and physical placement of a child directs courts to "consider all facts relevant to the best interest of the child." Wis. Stat. § 767.41(5)(am) (emphasis *128 added). Indeed, the legislature has enumerated 16 factors that may be relevant for a court's consideration in determining the best interest of a child, including agreements by a parent.
¶ 87. The majority opinion ignores the statutes and creates its own standard for deciding the legal custody and physical placement of the child. The guiding principle for legal custody and physical placement when a surrogacy agreement is implicated, according to the majority opinion, will be the custody and placement provisions set forth in the surrogacy contract unless enforcement of the contract is "contrary to the best interests of the child," Majority op., ¶¶ 3, 4, 30, 31, 55, 69, 74, 75.
¶ 88. The majority opinion departs from the legislative mandate. Yet the majority opinion does not explain why a child born of alternative reproductive methods should have different rights and be treated differently under the custody and placement statutes than any other child.
I
¶ 89. The question whether to enforce surrogacy contracts is a matter of first impression for this court, but not for legislatures and courts of other states and nations and not for legal commentators and scholars. In the last three years alone, over 180 law journal articles have been published addressing surrogacy contracts.
¶ 90. Nonetheless, the majority opinion has no hesitancy in declaring that public policy supports the enforcement of such contracts. Majority op., ¶¶ 64, 69. Yet the validity of surrogacy contracts, in whole or in part, is at this very time being debated across the globe.
¶ 91. Other states and nations are, at best, divided over whether to enforce such contracts because of *129 the difficult public policy issues they present. A recent law review article summarized the various approaches to surrogacy contracts from state to state as follows:
There is no clear majority approach to surrogacy. There is not even a clear plurality approach. Some states permit and enforce a wide range of surrogacy contracts. Some enforce only a limited subset of such contracts. Many states have no law on the subject or refuse to enforce surrogacy contracts. Three states not only refuse to enforce surrogacy contracts, but impose civil or criminal penalties on those arranging and entering into surrogacy contracts.[4]
¶ 92. Beyond the fact that there is no clear majority approach to surrogacy among the states that have acted, many states still have said virtually nothing on the topic.[5] Among those that have acted, the legislative approach varies significantly from state to state.[6]
*130 ¶ 93. Several state legislatures ban traditional surrogacy contracts, while others permit traditional surrogacy contracts under certain circumstances. Some states differentiate between traditional and gestational surrogacy contracts. In some states in which no statutes cover surrogacy contracts, courts have held surrogacy contracts void and unenforceable as contrary to public policy.[7]
¶ 94. Law review articles have tracked the status of surrogacy contracts around the world.[8] Only a limited number of nations have explicitly addressed surro *131 gacy by statute or through court rulings.[9] Several countries have rejected movements to permit surrogacy within their countries. Some countries that recognize surrogacy have legalized altruistic surrogacy but not commercial surrogacy.[10]
¶ 95. These conflicting approaches have transnational implications, one result being that some American states with less restrictive or no laws on the issue have become interstate and international medical surrogacy tourism destinations. It is estimated that over 1,400 babies are born in the United States each year for international parents with the assistance of a surrogate, sometimes American, sometimes foreign.[11]
*132 ¶ 96. Thus, the present case is significant for people in Wisconsin and around the world.
¶ 97. As I see it, many public policy issues involving the traditional surrogate, the biological father, and the child may be at stake in a legal custody and physical placement dispute in which a surrogacy contract is implicated.[12] Surrogacy contracts by their very nature focus on the interests of the signatories and the signatories' views of what is in the best interest of the child at the time the contract is executed. See majority op., ¶ 1. A court must view the legal custody and physical placement of a child, irrespective of the means of reproduction, through a wider lens, with emphasis on the best interest of the child, including the legal and constitutional rights of the child, at the time of the court proceedings.
¶ 98. The public policy implications of a traditional surrogacy contract when the legal custody and *133 physical placement of an existing child are at issue, as in the present case, include:
• Public policy against baby-buying;[13]
• Public policy against the exploitation of women;[14]
*134 • Statutes and case law relating to adoption, including terms of consent,[15] termination of parental rights,[16] and the payment of funds;[17] and
• Statutes and case law governing legal custody and physical placement focusing on the best interests of the child.[18]
*135 ¶ 99. In my opinion, when faced with a dispute relating to legal custody and physical placement of a child, a circuit court must carefully scrutinize the surrogacy contract to ensure that the contract does not contravene public policy. I do not join the majority's overly broad holding that "a [Parentage Agreement] is a valid, enforceable contract unless enforcement is contrary to the best interests of the child." Majority op., ¶ 3 (emphasis added).
II
¶ 100. I turn now to the second issue, namely what rule of law the circuit court should apply to decide the legal custody and physical placement of the child in the present case.
¶ 101. The majority opinion creates its own law, instructing circuit courts to enforce the Parentage Agreement unless enforcement is contrary to the best interests of the child. Majority op., ¶¶ 3, 4, 30, 31, 55, 69, 74, 75.[19]
¶ 102. In contrast with the majority opinion, I would instruct the circuit court to adhere to the legislature's directions in Wis. Stat. § 767.41(5)(am). *136 This statute explicitly governs a circuit court's determination of legal custody and physical placement of a child.
¶ 103. The majority opinion deviates from the statute by boldly but erroneously asserting that this action is not an "action affecting the family." Majority op., ¶ 43.
¶ 104. On the contrary, the present case is, without question, "an action affecting the family" and is governed by Chapter 767 of the statutes.
¶ 105. The statute, Wis. Stat. § 767.001, defines "action affecting the family" to mean an action to determine paternity, a custody action, and an action concerning physical placement, in addition to other actions.[20] David Rosecky, the biological father (and not the husband of the biological mother) brought the instant case as a paternity action. A paternity action protects a biological father's rights associated with the parentage of a child.
¶ 106. David Rosecky had to have a court determination of paternity. The Wisconsin statutes create a presumption that the husband of the birth mother (not David Rosecky) is the biological father of the child.
*137 ¶ 107. According to the statutes, a husband is presumed to be the father of a child when the child is born during wedlock.[21] Furthermore, another statute provides that when a woman is artificially inseminated with semen donated by a man who is not her husband, the husband is deemed the natural father of the child (and the donor has no rights regarding the child) [22] *138 Several eases implicating these statutes have come to Wisconsin appellate courts to determine the paternity of a child born during a marriage.[23]
¶ 108. David Rosecky's paternity petition asked the circuit court to determine that David Rosecky is the father of the child for all legal purposes, to direct the section of Vital Statistics for the State of Wisconsin to identify David Rosecky as the birth father of the child,[24] and to determine that David Rosecky shall have legal custody and physical placement of the child.
¶ 109. After the paternity action was filed, and as part of the paternity action, the parties stipulated that David Rosecky is the father of the child and that the surrogate mother's husband shall be excluded as the father of the child.
*139 ¶ 110. In a paternity action, a circuit court may decide legal custody and physical placement of the named child. Wisconsin Stat. § 767.41(l)(b) provides that in rendering a judgment of paternity, "the court shall make provisions as it deems just and reasonable concerning the legal custody and physical placement of any minor child of the parties ..." (emphasis added). Wisconsin Stat. § 767.41(1) provides, inter alia, that "the question of a child's custody may be determined as an incident of any action affecting the family . . . ."
¶ 111. Accordingly, Chapter 767, which governs "actions affecting the family," governs the present case for at least three distinct reasons; the present case involves three actions affecting the family: custody, physical placement, and paternity. Majority op., ¶ 13-14. The Parentage Agreement itself supports the conclusion that the present case involves an action affecting the family, as the Agreement specifically includes "the parties' agreements as to parentage, legal custody, and physical placement." Majority op., ¶ 10.
¶ 112. Under Chapter 767, the legislature has directed that "in determining legal custody and periods of physical placement, the court shall consider all facts relevant to the best interest of the child (emphasis added)." Wis. Stat. § 767.41(5)(am). "Child" is statutorily defined to mean an individual who has not attained 18 years of age.[25] The individual whose paternity, custody, and placement are the subject of the present case has not attained 18 years of age. The statutes governing paternity, legal custody, and placement govern all children; they do not differentiate among children on the basis of the reproductive methods used. The majority opinion should not do so either.
*140 ¶ 113. Wisconsin Stat. § 767.41(5)(am) has enumerated 16 facts relevant in determining the best interest of the child. For purposes of analysis, these factors "can be grouped into four broad categories . . .: (1) factors that analyze the wishes of the parents and the child; (2) factors that analyze the stability and consistency of the parents' relationship with the child; (3) factors that focus on the physical and mental health of the parties and the children; and (4) factors that look at the behaviors of each party."[26]
¶ 114. Section 767.41(5)(am) provides as follows:
Wis. Stat. § 767.41(5) Factors in custody and physical placement determinations, (am)... in determining legal custody and periods of physical placement, the court shall consider all facts relevant to the best interest of the child. The court may not prefer one parent or potential custodian over the other on the basis of the sex or race of the parent or potential custodian.... [T]he court shall consider the following factors in making its determination:

1. The wishes of the child's parent or parents, as shown by any stipulation between the parties, any proposed parenting plan or any legal custody or physical placement proposal submitted to the court at trial.

2. The wishes of the child, which may be communicated by the child or through the child's guardian ad litem or other appropriate professional.
3. The interaction and interrelationship of the child with his or her parent or parents, siblings, and any other person who may significantly affect the child's best interest.
*141 4. The amount and quality of time that each parent has spent with the child in the past, any necessary changes to the parents' custodial roles and any reasonable life-style changes that a parent proposes to make to be able to spend time with the child in the future.
5. The child's adjustment to the home, school, religion and community.
6. The age of the child and the child's developmental and educational needs at different ages.
7. Whether the mental or physical health of a party, minor child, or other person living in a proposed custodial household negatively affects the child's intellectual, physical, or emotional well-being.
8. The need for regularly occurring and meaningful periods of physical placement to provide predictability and stability for the child.
9. The availability of public or private child care services.
10. The cooperation and communication between the parties and whether either party unreasonably refuses to cooperate or communicate with the other party.
11. Whether each party can support the other party's relationship with the child, including encouraging and facilitating frequent and continuing contact with the child, or whether one party is likely to unreasonably interfere with the child's continuing relationship with the other party.
12. Whether there is evidence that a party engaged in abuse, as defined in s. 813.122(l)(a), of the child, as defined in s. 48.02(2).
12m. Whether any of the following has a criminal record and whether there is evidence that any of the following has engaged in abuse, as defined in s. *142 813.122(l)(a), of the child or any other child or neglected the child or any other child:
a. A person with whom a parent of the child has a dating relationship, as defined in s. 813.12(l)(ag).
b. A person who resides, has resided, or will reside regularly or intermittently in a proposed custodial household.
13. Whether there is evidence of interspousal battery as described under s. 940.19 or 940.20(lm) or domestic abuse as defined in s. 813.12(l)(am).
14. Whether either party has or had a significant problem with alcohol or drug abuse.
15. The reports of appropriate professionals if admitted into evidence.
16. Such other factors as the court may in each individual case determine to be relevant.
(Emphasis added.)
¶ 115. No one factor enumerated in Wis. Stat. § 767.41(5) is necessarily determinative of custody, and the same combination of factors does not necessarily call for an identical answer in two different cases.[27]
¶ 116. Significant for the present case is that the legislature has explicitly instructed a circuit court how to address agreements between parents and any legal or custody proposal submitted to the court. The legislature envisaged agreements and proposals, and the legislature has directed courts to consider "the wishes of the child's parent or parents, as shown by any stipulation between the parties, any proposed parenting plan or any legal *143 custody or physical placement proposal submitted to the court at trial." Wis. Stat. § 767.41(5) (am) 1. The legislature did not direct the courts to rubber stamp the proposal or order specific performance of an agreement relating to custody and physical placement, as David Rosecky requests. Majority op., ¶ 13.
¶ 117. I agree with the majority opinion that the circuit court in the present case erroneously exercised its discretion by refusing to consider the Parentage Agreement. I think such consideration is required by Wis. Stat. § 767.41(5).
¶ 118. The majority opinion, however, does not require a circuit court to consider the other relevant enumerated factors in § 767.41(5) to determine the best interest of the child. Instead the majority opinion states a new rule: A circuit court is bound by a surrogacy contract "unless enforcement is contrary to the best interests of the child." Majority op., ¶¶ 3, 4, 30, 31, 55, 69, 74, 75.
¶ 119. The majority opinion errs as a matter of law by not adhering to the statutory standard set forth in Wis. Stat. § 767.41(5). The majority opinion errs as a matter of law by placing the surrogacy contract above, and to the exclusion of, all other factors the legislature has enumerated in Wis. Stat. § 767.41(5) (am) and above the best interest of the child.
¶ 120. The best interest of the child is an organizing principle of Wisconsin family law. See majority op., ¶ 62. According to our case law, "The legislature has clearly and repeatedly expressed the policy that courts are to act in the best interest of children."[28] "The *144 polestar [in a custody dispute] is the best interests of the children."[29]
¶ 121. The legislature has made clear that "[t]he child's best interests transcend an agreement or stipulation of the parties."[30] This court has long recognized that "the controlling question [in custody disputes] is not what the parties agreed to but what is in the best interest of the child."[31] Our court has further explained the statutory relationship of an agreement of parties and the child's best interest as follows:
While parents may stipulate as to custody, the agreement should not be approved by the court unless it insures and promotes the best interest of the children. ... A contract between parents [in a custody dispute] should be given serious consideration by the court as it normally expresses what may be best for the child, nevertheless it does not bind the court or preclude a modification of a decree based thereon.[32]
¶ 122. Although the majority opinion mentions Wis. Stat. § 767.41(5) and the best interest of the child standard in passing, see majority op, ¶ 62, it does not rely on § 767.41(5) or the best interest of the child standard. Rather, it decides, for purposes of all surrogacy contracts, for all children, for all persons, and for all circumstances, that "the interests supporting en *145 forcement of the [Parentage Agreement] are more compelling than the interests against enforcement." Majority op., ¶ 61. The majority opinion adopts its own formulation of a rule for determining custody and placement that directs circuit courts to follow the contract unless "contrary to the best interests of the child," without explanation, discussion, or direction to the courts on how the rule should be applied. Majority op., ¶¶ 3, 75. See also ¶¶ 4, 30, 31, 55, 69, 74.[33]
¶ 123. So why doesn't the majority opinion adhere to Wis. Stat. § 767.41(5) in the present case? This is a mandatory (shall) statute that is directly on point.
¶ 124. The majority opinion explains that "surrogacy is not one of those enumerated" actions affecting the family, majority op., ¶ 43; surrogacy agreements are not explicitly addressed in Chapter 767 or in Wis. Stat. § 767.41(5); a surrogacy agreement does not present a typical custody case; "the law does not specifically address the legal issues presented in this surrogacy dispute," majority op., ¶ 55; and that some of the statutory factors enumerated in § 767.41(5) are difficult to apply. Majority op., ¶¶ 43, 44, 45, 55.[34]
¶ 125. This reasoning in the majority opinion justifying its disregarding Wis. Stat. § 767.41(5) is confusing, contradictory, and unpersuasive.
*146 ¶ 126. The present case is a paternity, child custody, and physical placement action; thus, it is "an action affecting the family" expressly governed by Chapter 767, including Wis. Stat. § 767.41(5). The legislature has explicitly and in plain language directed courts how to address these actions, including parties' agreements about custody and placement.
¶ 127. Simply because the words "surrogacy contract" or "Parentage Agreement" do not appear in Chapter 767 or Wis. Stat. § 767.41 (5)(am) does not mean, as the majority opinion reasons, that the statute does not apply to legal custody and physical placement disputes that implicate a surrogacy contract. Majority op., ¶ 43. The legislature is aware of alternative methods of reproduction and surrogacy, see majority op., ¶¶ 41, 42, and has not excluded surrogacy agreements from the application of Chapter 767 or § 767.41(5). Rather, the legislature explicitly anticipated that courts should consider parental agreements, without restricting such agreements to the reproductive method used or the title of the agreement.
¶ 128. If a surrogacy contract should be treated differently than any other type of agreement, the legislature has not instructed the courts to take this distinction into account in exercising discretion under Wis. Stat. § 767.41(5).
¶ 129. Absent specific statutory instructions that provide a different procedure for adjudicating legal custody and physical placement disputes when an alternative reproductive method and a surrogacy contract are implicated, the circuit courts of this state are, in my opinion, bound to follow the legislative directions for adjudicating legal custody and physical placement for all children set forth in Wis. Stat. § 767.41.
*147 ¶ 130. The plain text of the current statutes applies to the present case. Any change in the law and the procedure regarding actions involving paternity, legal custody, and physical placement of a child when an alternative reproductive method and a surrogacy contract are implicated should not be undertaken by this court. Any change is a task best left to the legislature.
¶ 131. For the reasons set forth, I write separately.
¶ 132. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

 The majority opinion seems to vacillate in reaching its conclusion. At times it appears to state that the enforcement of the Parentage Agreement in the present case is not contrary to statutes, case law, or public policy. At other times, the majority opinion reads more broadly to state that the public policy of Wisconsin supports surrogacy agreements in general and that no Wisconsin statute or case contains a specific statement of public policy contrary to surrogacy agreements.
Under either interpretation, the majority opinion does not address the numerous public policy issues regarding the validity of this agreement and surrogacy agreements in general, including the following: must the agreement be in writing; should compensated agreements be allowed and what are the limits on compensation; should the availability of surrogacy be limited to married couples or to infertile intended parents; should the age of any party be limited; should a spouse be required either to consent or to be made a party to the contract; must each individual involved be represented by counsel; should the State require that information about each individual's legal rights be provided; what provisions are valid regarding who makes decisions about health care and termination of the pregnancy; how and when may the agreement be terminated; and must any party to the agreement be given the opportunity to change his or her mind before or after the birth of the child?

 Policy decisions to be made in validating or voiding surrogacy agreements appear in the case law and statutes of other states and nations. See, e.g., Unif. Parentage Act Art. 8, 9B U.L.A. 360 (2000) (gestational agreement); American Bar Association, Model Act Governing Assisted Reproductive Technology (2008), available at http://apps.americanhar.org/family/ committees/artmodelact.pdf (last visited June 28, 2013).

 Paul G. Arshagouni, Be Fruitful and Multiply, by Other Means If Necessary: The Time Has Come to Recognize and Enforce Gestational Surrogacy Agreements, 61 DePaul L. Rev. 799, 800 (2012). See generally Raftopol v. Ramey, 12 A.3d 783, 801-804 n.35-46 (Conn. 2011) (collecting statutes and cases). See majority op., ¶ 64 n.11.

 7 Williston on Contracts § 16.22 Surrogacy Agreements (4th ed. 2012). See also Darra L. Hofman, "Mama's Baby, Daddy's Maybe:" A State-by-State Survey of Surrogacy Laws and Their Disparate Gender Impact, 35 Wm. Mitchell L. Rev. 449 (2009).

 See, e.g., Ala. Code § 26-10A-34(c) (2013); Ariz. Rev. Stat. Ann. § 25-218 (2012); Ark. Code Ann. § 9-10-201(b) (West 2013); D.C. Code §16-402 (2012); Fla. Stat. Ann. §§ 63.212-.213, § 742.15 (West 2011); Ind. Code Ann. §§ 31-20-1-1 to -3 (West 2013); 750 Ill. Comp. Stat. Ann. §§ 47/1 to /75 (West 2010); Iowa Code Ann. § 710.11 (West 2013); Ky. Rev. Stat. Ann. § 199.590(4) (West 2012); La. Rev. Stat. Ann. § 9:2713 (2012); Mich. Comp. Laws Ann. §§ 722.851-.863 (West 2013); Neb. Rev. Stat. § 25-21,200 (2012); Nev. Rev. Stat. Ann. § 126.045 (West 2011); *130 N.H. Rev. Stat. Ann. §§ 168-B:1 to B:32 (2013); N.Y. Dom. Rel. Law §§ 121-124 (McKinney 2010); N.D. Cent. Code §§ 14-18-05, -08 (2011); Tex. Fam. Code Ann. §§ 160.751-.763 (Vernon 2013); Utah Code Ann. §§ 78B-15-801 to -809 (West 2012); Va. Code Ann. §§ 20-156 to -165 (West 2012); Wash. Rev. Code Ann. §§ 26.26.210-260 (West 2013).
See also 7 Williston on Contracts § 16.22 n.12 (4th ed. 2012) (Surrogacy Agreements); Anne R. Dana, Note, The State of Surrogacy Laws: Determining Legal Parentage for Gay Fathers, 18 Duke J. Gender L. & Pol'y 353, Appendix 1 (2010-2011). See generally Raftopol, 12 A.3d at 801-804 n.35-46 (collecting statutes and cases).

 See, e.g., In re Marriage of Moschetta, 30 Cal. Rptr. 2d 893 (Cal. Ct. App. 1994); R.R. v. M.H., 689 N.E.2d 790 (Mass. 1998); Matter of Baby M., 537 A.2d 1227 (N.J. 1988).

 0 See, e.g., Daniel Gruenbaum, Foreign Surrogate Motherhood: Mater Semper Certa Erat, 60 Am. J. Comp. L. 475 (2012); Ailis L. Burpee, Note, Momma Drama: A Study of How Canada's National Regulation of Surrogacy Compares to Australia's Independent State Regulation of Surrogacy, 37 Ga. J. Int'l & Comp. L. 305, 309 (2008-2009); Austin Caster, Note, Don't Split the Baby: How the U.S. Could Avoid Uncertainty and Unnecessary Litigation and Promote Equality by Emulating the British Surrogacy Law Regime, 10 Conn. Pub. Int. L.J. 477 (2010-2011); Sarah Mortazavi, Note, It Takes a Village to Make a Child: Creating Guidelines for International Surrogacy, 100 Geo. L.J. 2249 (2012); Sasha N. Swoveland, Note, *131 Surrogacy and Insurance: The Call for Statutory Reform in Ohio, 26 J.L. & Health 143 (2013).

 For example, the United Kingdom, one of the more common surrogacy centers, has a uniform surrogacy law that employs an independent ethics committee to evaluate surrogacy requests on a case-by-case basis and recognizes parents through parental orders. Parental rights are based on the welfare of the child. Human Fertilisation and Embryology Act, 1990, c. 37 (U.K.) (amended 2008), available at http://www.legislation. gov.uk/ukpga/1990/37/contents/enacted (last visited June 28, 2013). See Mortazavi, supra note 8, at 2270-71.

 In a commercial surrogacy arrangement, the surrogate and often a third party stand to gain financially from the birth of the child. In contrast, an altruistic surrogacy arrangement may involve payment to the surrogate to cover expenses associated with the pregnancy and birth, but neither she nor a third party is paid a fee for the service itself. See Burpee, supra note 8, at 309.
For the Canadian law, see Assisted Human Reproduction Act, S.C. 2004, c. 2 (Can.), available at http://laws-lois.justice. gc.ca/PDF/A-13.4.pdf (last visited June 28, 2013).

 Swoveland, supra note 8, at 164.
The United States is second only to India in providing surrogates. India, with no law on the issue, permits both commercial and altruistic surrogacy arrangements and has become a popular medical surrogacy tourism destination for *132 couples seeking lower-cost surrogacy arrangements without being mired in red tape. Mortazavi, supra note 8, at 2271-72; Kathleen Parker, Editorial, Surrogacy Exposed, Wis. State J., May 26, 2013, at E3. See also Emanuella Grinberg, The highs and lows of foreign surrogacy, CNN Living (Mar. 29, 2012) available at http://www.cnn.com/2012/03/29diving/sacredthread-foreign-surrogacy/ (last visited June 28, 2013).

 For example, a dispute may arise when the surrogate or the intended parents seek an abortion. See Elizabeth Cohen, Surrogate Offered $10,000 to Abort Baby, CNN Health (Mar. 6, 2013), available at http://www.cnn.com/2013/03/04/health/ surrogacy-kelley-legal-battle/index.html (last visited June 28, 2013) (Medical tests showed an abnormality of the fetus. The agreement entered into in the State of Connecticut authorized the intended parents to determine whether an abortion would be performed; the surrogate refused an abortion and moved to a state that appeared to have laws more favorable to the surrogate's position.).

 In the first surrogacy case in the country, the New Jersey Court declared:
We have found that our present laws do not permit the surrogacy contract used in this case. Nowhere, however, do we find any legal prohibition against surrogacy when the surrogate mother volunteers, without any payment, to act as a surrogate and is given the right to change her mind and to assert her parental rights. Moreover, the Legislature remains free to deal with this most sensitive issue as it sees fit, subject only to constitutional constraints.
Baby M., 537 A.2d at 1264.
Wisconsin statutes regulate payments regarding children. See, e.g., Wis. Stat. § 48.913 (allowing certain payments by proposed adoptive parents to birth parent); Wis. Stat. § 948.24 (criminalizing payments for child placement and services not explicitly authorized by statute). See majority op., ¶¶ 45, 53.

 The Michigan court of appeals explained the compelling state interests in prohibiting surrogacy contracts as follows: (1) preventing children from becoming mere commodities; (2) protecting the best interests of the child, because surrogacy arrangements focus solely on the parents' interests and desires; and (3) preventing the exploitation of women. Doe v. Attorney Gen., 487 N.W.2d 484 (Mich. Ct. App. 1992).
For a discussion of the advertising directed at prospective surrogates, the fees paid to them, the third parties who benefit from arranging surrogacy contracts, and the potential for exploiting poor women, see Kathleen Parker, Editorial, Surrogacy Exposed, Wis. State J., May 26, 2013, at E3 ("[W]e haven't scraped the surface of the metaphysical, spiritual, emotional, [and] psychological issues" that accompany the surrogacy business.).
A simple Google search of "Wisconsin Surrogacy" turns up advertisements offering up to $50,000 for women to serve as surrogates.

 Wisconsin has stringent requirements for voluntary consent to terminate parental rights that require a parent to appear in court or provide written consent in the presence of a judge, embassy, or consulate official. See Wis. Stat. § 48.41. In adoption situations, a mother can withdraw her consent even after agreeing to give her child up for adoption. Matter of Adoption of R.P.R., 98 Wis. 2d 613, 619, 297 N.W.2d 833 (1980).

 Indeed the majority opinion strikes down a provision of the Parentage Agreement regarding the termination of parental rights on the ground that the Agreement violates Wisconsin statutes. Majority op., ¶ 65.
Other states have also declared surrogacy contracts or parts thereof invalid because they conflict with legislation governing adoption and the termination of parental rights, the public policy embodied in the statutes, and case law. See Baby M., 537 A.2d at 1242-44.
The California court of appeals refused to give effect to the terms of a traditional surrogacy agreement, holding that "enforcement of a traditional surrogacy contract by itself is incompatible with the parentage and adoption statutes already on the books." Moschetta, 30 Cal. Rptr. 2d at 894-95.
Compare these decisions refusing to enforce traditional surrogacy contracts with court decisions approving gestational surrogacy arrangements. See, e.g., Johnson v. Calvert, 851 P.2d 776 (Cal. 1993); Raftopol v. Ramey, 12 A.3d 783 (Conn. 2011); J.F. v. D.B., 879 N.E.2d 740 (Ohio 2007).

 In New York, a surrogacy agreement was declared void and unenforceable because it violated the statutory prohibition against acceptance of compensation in exchange for the surrender of a child for adoption. Matter of Adoption of Paul, 550 N.Y.S.2d 815 (1990). New York has since banned surrogacy contracts by statute. N.Y. Dom. Rel. Law §§ 122-123 (McKinney 2010).

 Doe v. Attorney Gen., 487 N.W.2d 484 (Mich. Ct. App. 1992).
*135 The Supreme Judicial Court of Massachusetts held that no private surrogacy agreement concerning the custody of a child can be conclusive, because a judge must decide what is in best interest of child. R.R. v. M.H., 689 N.E.2d 790 (Mass. 1998).

 The phrase "contrary to the best interest of the child" is not entirely new to Wisconsin statutes. None of the statutes using the phrase applies to the present case. The legislature seems to have given guidance to the courts in these statutes regarding what is contrary to the best interests of the child. See, e.g., Wis. Stat. §§ 48.365(2g)(b)3., 48.977(2)(f), 767.41(2)d)l., 767.80(2), 938.18(6) ("contrary to the best interests of the juvenile").

 Wisconsin Stat. § 767.001, "Definitions," provides in relevant part:
In this chapter:
(1) "Action affecting the family" means any of the following
actions:
(e) Custody.
(k) Concerning periods of physical placement or visitation rights to children, including an action to prohibit a move with or the removal of a child under s. 767.481(3)(c).
(L) To determine paternity.

 Wisconsin Stat. § 891.41 provides as follows:
891.41. Presumption of paternity based on marriage of the parties.
(1) A man is presumed to be the natural father of a child if any of the following applies:
(a) He and the child's natural mother are or have been married to each other and the child is conceived or born after marriage and before the granting of a decree of legal separation, annulment or divorce between the parties.
(b) He and the child's natural mother were married to each other after the child was born but he and the child's natural mother had a relationship with one another during the period of time within which the child was conceived and no other man has been adjudicated to be the father or presumed to be the father of the child under par. (a).
(2) In a legal action or proceeding, a presumption under sub. (1) is rebutted by results of a genetic test, as defined in s. 767.001 (lm), that show that a man other than the man presumed to be the father under sub. (1) is not excluded as the father of the child and that the statistical probability of the man's parentage is 99.0% or higher, even if the man presumed to be the father under sub. (1) is unavailable to submit to genetic tests, as defined in s. 767.001 (lm).

 Wisconsin Stat. § 891.40 provides as follows:
891.40. Artificial insemination
(1) If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband of the mother at the time of the conception of the child shall be the natural father of a child conceived. The husband's consent must be in writing and signed by him and his wife. The physician shall certify their signatures and the date of the insemination, and shall *138 file the husband's consent with the department of health services, where it shall be kept confidential and in a sealed file except as provided in s. 46.03(7)(bm). However, the physician's failure to file the consent form does not affect the legal status of father and child. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician or elsewhere, may be inspected only upon an order of the court for good cause shown.
(2) The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is not the natural father of a child conceived, bears no liability for the support of the child and has no parental rights with regard to the child.

 See, e.g., Randy A.J. v. Norma I.J., 2004 WI 41, 270 Wis. 2d 384, 677 N.W.2d 630 (husband filed for divorce seeking custody of child; wife counterclaimed challenging husband's paternity); In re Paternity of T.R.B., 160 Wis. 2d 840, 467 N.W.2d 553 (Ct. App. 1991) (single man filed paternity claim to child born to another man's wife); Strawser v. Strawser, 126 Wis. 2d 485, 377 N.W.2d 196 (Ct. App. 1985) (on divorce, husband challenged paternity of children born during marriage).

 Birth certificates may be changed by the state registrar of vital statistics. See Wris. Stat. §§ 69.01(24), 69.15(1).

 Wis. Stat. §§ 822.02(2); 767.01(2m).

 Thomas J. Walsh, In the Interest of A Child: A Comparative Look at the Treatment of Children Under Wisconsin and Minnesota Custody Statutes, 85 Marq. L. Rev. 929, 944 (2001-2002) (emphasis added).

 King v. King (King II), 29 Wis. 2d 586, 590-91, 139 N.W.2d 635 (1966).

 Holtzman v. Knott, 193 Wis. 2d 649, 682, 533 N.W.2d 419 (1995).

 Johnson v. Johnson, 78 Wis. 2d 137, 148, 254 N.W.2d 198 (1977).

 Frisch v. Henrichs, 2007 WI 102, ¶ 72, 304 Wis. 2d 1, 736 N.W.2d 85 (quoting Ondrasek v. Tenneson, 158 Wis. 2d 690, 695, 462 N.W.2d 915 (Ct. App. 1990)).

 King v. King (King I), 25 Wis. 2d 550, 555, 131 N.W.2d 357 (1964).

 King I, 25 Wis. 2d at 555 (citing William T. Nelson, Divorce and Annulment § 15.21 at 268 (2d ed. rev. 1961); Miner v. Miner, 10 Wis. 2d 438, 103. N.W.2d 4 (1960)).

 The guardian ad litem argued that the surrogacy contract should be presumptively enforceable as long as it is in the best interest of the child. See majority op., ¶ 52.

 Presumably, the 16 factors enumerated in Wis. Stat. § 767.41(5)(am) will have different levels of importance in each custody and physical placement case. Is the majority instructing us to ignore all of them because some or even many are "difficult to apply to the facts" of the specific case? See majority op., ¶ 43. Still, in ¶ 71, the majority points out that circuit courts have discretion to follow § 767.41(5) to determine what is in the child's best interests. How can ¶ 43 and ¶ 71 be reconciled?